IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SOFIA SCHWARZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 03 C 7096 |
| | ) | |
| NATIONAL VAN LINES, INC., | ) | Judge Amy St. Eve |
| DWAYNE SCHIESSER, and | ) | |
| APEX RELOCATION SPECIALISTS, | ) | Magistrate Judge Bobrick |
| INC., | ) | |
| | ) | |
| Defendants. | ) | |

**DOCKETED**

**NOV 1 8 2003**

## NOTICE OF FILING

TO:   Jeffrey R. Simmons
DeConcini McDonald Yetwin & Lacy, P.C.
2025 North 3rd Street, Suite 230
Phoenix, Arizona 85004-1472

PLEASE TAKE NOTICE that on this 14th day of November, 2003, we filed with the Clerk of the U.S. District Court for the Northern District of Illinois the **First Amended Complaint**, a copy of which is attached hereto and herewith served upon you.

SOFIA SCHWARZ

By: _____
One Of Her Attorneys

José A. Isasi, II
Carey L. Bartell
Sachnoff & Weaver, Ltd.
30 S. Wacker Drive, Suite 2900
Chicago, IL 60606
(312) 207-1000

## CERTIFICATE OF SERVICE

I, Carey L. Bartell, an attorney, certify that I caused copies of the foregoing Notice and attached document to be served upon all parties set forth in this notice by U.S. Mail delivery this 14th day of November, 2003.

_____
Carey L. Bartell



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SOFIA SCHWARZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 03 C 7096 |
| | ) | |
| NATIONAL VAN LINES, INC., | ) | Judge Amy St. Eve |
| DWAYNE SCHIESSER, and | ) | |
| APEX RELOCATION SPECIALISTS, | ) | Magistrate Judge Bobrick |
| INC., | ) | |
| | ) | |
| Defendants. | ) | |

DOCKETED

NOV 1 8 2003

## FIRST AMENDED COMPLAINT

### PARTIES

1. Plaintiff is a U. S. citizen and resides in Keizer, Oregon.

2. Defendant National Van Lines, Inc. ("National") is a corporation incorporated under the laws of the State of Illinois and is a motor carrier engaged in the business of transporting household goods. National has its headquarters and principal place of business in Broadview, Illinois and transacts business in Cook County, Illinois.

3. On information and belief, Defendant Dwayne Schiesser (also known by the alias Dwayne Schiesses) is a U.S. citizen and resides in the State of Texas.

4. Defendant Apex Relocation Specialists, Inc. ("Apex") is a corporation incorporated under the laws of the State of Texas. At times relevant to this lawsuit, Apex provided interstate shipping of household goods, both as a disclosed agent of National and on its own behalf. Apex transacts business in Cook County, Illinois. Apex has its principal place of business in Euless, Texas.

5. On information and belief, Apex is owned and/or operated by Schiesser.

## JURISDICTION

6.       Federal question jurisdiction exists in this Court for Count I – Breach Of Contract (Bill of Lading) pursuant to 28 U.S.C. §1331, since Plaintiff's claim arises in part under 49 U.S.C. §14706 (the Carmack Amendment).  Federal question jurisdiction also exists for Count VII (RICO) since Plaintiff's claim arises under 18 U.S.C. § 1961 *et seq.*  Jurisdiction exists for Plaintiff's claims for Count II (Conversion), Count III (Intentional Infliction of Emotional Distress), Count IV (Negligent Infliction of Emotional Distress), Count V (Breach of the Implied Covenant of Good Faith and Fair Dealing), and Count VI (Constructive Fraud Based On Breach of Fiduciary Duty), under the doctrine of pendant jurisdiction.

7.       Jurisdiction for all claims also exists pursuant to 28 U.S.C. §1332, since diversity exists between Plaintiff and all Defendants, and the total damages sought exceed $75,000.

## VENUE

8.       Many of the events giving rise to this claim occurred within this District.   In addition, National resides within this District.  Thus, venue in this Court is proper pursuant to 28 U.S.C. §1391 (a) and (b) (2).

## FACTUAL BACKGROUND TO ALL COUNTS

9.       At the time of the events giving rise to this lawsuit, Plaintiff, a widow in her late-60s, was embarking on a new career: to open her own business, a café and pastry shop, with her sister in Salem, Oregon.

10.       In pursuit of that dream, Plaintiff moved from Seattle, Washington to Scottsdale, Arizona in January 1999 to attend the Scottsdale Culinary Institute for an intensive training program.  She then worked professionally at the Four Seasons Resort in Scottsdale before intending to return to the Pacific Northwest to set up her own pastry business.  This 2-year

209080/0001/617563/Version #:.1

training period yielded 18 voluminous notebooks of culinary classroom and kitchen study materials, business set-up formulas, wine and spirits information, Four Seasons recipes, and numerous relevant cookbooks, all unique and crucial to Plaintiff's intended new professional culinary pastry business.

### Plaintiff's Move From Arizona to Oregon

11.     By December 2000, Plaintiff was ready to return to Salem to begin the next phase of her life.  Plaintiff contacted Central Moving & Storage ("Central"), a disclosed agent of National Van Lines, Inc., to contract for moving services.  At all times described herein, Central's acts were related to the performance of household goods transportation services and were within the actual or apparent authority conveyed upon it by National.

12.     On or about December 13, 2000, Carl Carter, owner of Central acting within the scope of his actual or apparent authority, arrived at Plaintiff's residence and gave her an estimate of National's fee to move her possessions from Scottsdale, Arizona to Salem, Oregon.

13.     Carter completed an Order For Service--Registration form and sent it by facsimile to Plaintiff to fill in her contact information in Salem, Oregon.  The facsimile cover sheet displayed National's insignia and listed Central as an "agent of National Van Lines, Inc. for interstate moves."  (A copy of the Order For Service--Registration with facsimile cover sheet is attached hereto as Exhibit A.)

14.     Carter instructed Plaintiff to fill in the insurance amount of $10,000 on the left side of the Order For Service--Registration form, sign the form, and fax it back to him.

15.     As reflected in the Order For Service--Registration form, Plaintiff's goods were to be loaded in Scottsdale between December 26, 2000 and December 30, 2000.  The goods were to be delivered to her destination in Salem between December 30, 2000 and January 10, 2001.

209080/0001/617563/Version #:.1

16.     On December 14, 2000, Plaintiff advised Carter of two changes.   Plaintiff changed the Requested Loading Dates from 12-27 to 12-30 and changed her insurance terms to Option A - Replacement Value Protection (Min. $3.50 lb.), No Claim Deductible.   Plaintiff considered her property worth more than $10,000 and agreed to pay the extra charge of $35.00 for the extra value protection.

17.     Carter agreed to Plaintiff's changes and prepared an Authorized Change To Order For Service (OFS) form.   He brought the OFS form to Plaintiff's residence on December 30, 2000 for her to sign.   (A copy of the Authorized Change to Order For Service (OFS) form is attached hereto as Exhibit B.)

18.     On December 27, 28, and 29, 2000, Plaintiff waited at her residence in anticipation of the arrival of the moving van.

19.     On December 30, 2000, Plaintiff called Central to inquire when a moving van could be expected, since it was now the last day of the requested 4-day pick-up spread.   Calls were exchanged throughout the day, and Central contacted National headquarters in Broadview, Illinois for information on the agent who had been expected to arrive at Plaintiff's residence for the past four days.   Central assured Plaintiff that National had assigned an agent for her shipment and that agent would arrive "momentarily."

20.     At the end of the day, Plaintiff received a cell phone call from Defendant Schiesser, acting within the scope of the actual or apparent authority conferred on him by National.   He explained that he was delayed because of tire problems and a broken axle on his truck.   He said he could not make it that day (it was already very late), but that he would arrive first thing in the morning.

21.     Plaintiff was forced to sleep in her clothes on her loveseat with a small blanket. All of the food had already been packed or given away, and Plaintiff was reluctant to leave her residence for meals for fear she would miss National's agent Schiesser's arrival.

22.     On December 31, 2000, Plaintiff had her entire household goods packed in anticipation of the National truck which should have arrived no later than December 30, 2000.

23.     By 10:00 a.m., Plaintiff had heard nothing from Schiesser. She left a message on his cell phone asking when he expected to arrive and requesting that he call her immediately. Schiesser returned the call, claiming that he was still working on his broken-down truck and was lost in his directions, but that he would be there by 12 Noon.

24.     Plaintiff became increasingly uneasy. She called Central for an explanation for the unreasonable delay and reminded Central that she was required to surrender her residence by the close of the business day. Central assured Plaintiff that National had sent a dependable agent, that Schiesser had hauled for National for the past nine (9) years, and that National had never had a problem with him before.

25.     When Schiesser had not arrived or contacted Plaintiff by 12:30 p.m., Plaintiff called Central again. Plaintiff pleaded with Central to cancel Schiesser and store her household goods in Central's warehouse until a more dependable agent could be found. Central once again assured Plaintiff that Schiesser had been an agent for National for nine years and that National had never had a problem with his services.

26.     At or about 1:30-2:00 p.m., Central called Plaintiff to inquire whether agent Schiesser had arrived. He had not. Tensions were rising, and Plaintiff was looking to Central for a decision.

5

27.     Schiesser finally called Plaintiff around 2:15 p.m., and said he was on his way to Plaintiff's residence. At the same time Central was sending three employees to help Schiesser pack and load Plaintiff's shipment. Schiesser apologized to Plaintiff and said he would make a reduction in the charges of Plaintiff's move.

28.     Schiesser arrived at Plaintiff's residence at about 3:00 p.m. in a large unmarked vehicle. It had no visible National Van Lines identification markings nor a federally-required DOT number posted on either side of the vehicle. It was, in fact, a rented Ryder truck with an attached low capacity trailer. Plaintiff was immediately suspicious of the truck, but Central's employees did not appear suspicious and proceeded to inventory, pack, and carry Plaintiff's household goods to the street to be loaded onto the Ryder truck by Schiesser.

29.     Schiesser and Central's employees completed loading Plaintiff's household goods onto the Ryder truck at about 6:00 p.m. The Household Goods Descriptive Inventory had been completed and signed by the Plaintiff, but not by Central or Schiesser. (A copy of the Household Goods Descriptive Inventory is attached hereto as Exhibit D.) The Packing and Accessorial Service Report had also been presented to the Plaintiff, which Plaintiff signed. (A copy of the Packing and Accessorial Service Report is attached hereto as Exhibit E.)

30.     At about 6:15 p.m., Schiesser entered Plaintiff's residence, presented Plaintiff with the Household Goods Bill of Lading and Freight Bill, and asked her to sign the document. Before signing, Plaintiff asked Schiesser about the allowance he had promised for being 26 hours tardy. Schiesser brusquely wrote in "Item #225" for $100.00. (A copy of the Household Goods Bill of Lading and Freight Bill is attached hereto as Exhibit C.)

209080/0001/617563/Version #:.1

31.     Schiesser then asked Plaintiff for an advance of $400 cash.  He claimed his funds had been spent on flat tires and broken axle.  Plaintiff declined, explaining that she was driving to Salem, Oregon and had only enough cash to reach her destination.

32.     Schiesser became irritated at Plaintiff's response, and brusquely asked Plaintiff to fill in the blank on the document that stated the value of her shipment.  Plaintiff immediately became frightened, suspicious that agent Schiesser may have an ulterior motive with her household goods because she had not acquiesced to his demand for an advance payment of $400.  She thought if she put down the actual value of her goods, Schiesser might sell her goods for the needed cash; she opted to fill in a modest figure of $25,000.

33.     Before leaving, Schiesser told Plaintiff he would call her on January 6, 2001 in Salem, Oregon to confirm delivery date and time.

34.     Plaintiff arrived at her new, temporary lodging at her sister's residence in Salem, Oregon on January 4, 2001.

35.     Schiesser called Plaintiff on January 6, 2001 and promised to call again on January 8, 2001 when he was closer to Salem, Oregon to confirm delivery on January 10, 2001.  At that point, Schiesser's promised schedule was consistent with the Delivery Date Spread from 12-30-00 to 1-10-01 as noted on Household Goods Bill of Lading and Freight Bill and the Order For Service--Registration.  (Exhibits A and C.)

36.     Plaintiff purchased a cashier's check in the amount owed, in anticipation of delivery of her household goods by Schiesser on January 10, 2001.

37.     On January 8, 2001, Schiesser failed to call or leave a message for Plaintiff.

38.     Plaintiff called Schiesser on his cell phone on January 9, 2001 and found it disconnected.

                                                   209080/0001/617563/Version #:.1

39.    On January 10, 2001, Schiesser failed to deliver Plaintiff's household goods to Salem, Oregon. Schiesser had disappeared. Schiesser's truck had disappeared. Plaintiff's entire inventory of household goods had disappeared, including the tools of her new trade and the materials she needed to set up her new business.

40.    After leaving Plaintiff's residence in Arizona, Schiesser apparently drove directly to Texas. Schiesser never drove to Oregon and never intended to deliver Plaintiff's property to her in Salem, Oregon.

### Plaintiff's Attempts To Get Her Goods Back

41.    From January 9 through January 16, 2001, Plaintiff repeatedly called Central in Coolidge, Arizona and National's Customer Service "1-800" number in Broadview, Illinois to report that Schiesser's telephone had been disconnected and to inquire about the status of her delivery. She received assurances from both Central and directly from National's Dispatcher, Greg Yurski, in Broadview that her property was still scheduled to be delivered on January 10, 2001.

42.    In one of her first telephone calls to National, Bob Donnelly, National's Head of Operations, asked Plaintiff for Schiesser's cell phone number. Plaintiff's reaction to this query was one of increasing anxiety and alarm that National would not have such an important piece of information on its agent in their files.

43.    Notwithstanding the assurances made by both Central and National, neither Central nor National was unable to locate the whereabouts of Schiesser, his truck, or Plaintiff's household goods.

44.    On January 16, 2001, Schiesser left a recorded telephone message to Plaintiff that Plaintiff could expect delivery of her overdue goods on January 20. Schiesser promised to call

again on January 17, 2001 to confirm delivery, but did not give any information about his whereabouts.

45.     January 17, 2001 came and went without a call from Schiesser.

46.     Throughout this time, Plaintiff stayed in daily contact with National and/or Central. Plaintiff told National's Donnelly that Schiesser had demanded $400 in cash after her goods had been loaded on his truck. Donnelly then asked Plaintiff what name was imprinted at the top of the Bill of Lading. Plaintiff replied, "National Van Lines, Inc." There was a momentary silence from Donnelly. Plaintiff did not understand why Donnelly appeared to be "silenced"/disturbed by the response.

47.     Rather than attempt to locate Schiesser and Plaintiff's goods, on January 18, 2001, Donnelly contacted Plaintiff's attorney and advised he would send Claims Forms to file for the loss of the entire household goods shipment. National's Donnelly was unwilling to provide information regarding their investigation of this mysterious disappearance, the whereabouts of Schiesser, the whereabouts of Plaintiff's shipment, or a new delivery date.

48.     Having failed to receive much-needed assistance and information from National, on January 19, 2001, Plaintiff contacted the Salem, Oregon Department of Transportation (DOT) office and learned for the first time that Schiesser was affiliated with Defendant Apex Relocation, Inc. from Euless, Texas. DOT records disclosed Apex carried no required interstate insurance, its common carrier status was revoked, numerous cancellations of insurance were noted, and attempts to reach Apex were to no avail because its telephone numbers had been disconnected. DOT's assessment to Plaintiff, "You will never see your goods again."

209080/0001/617563/Version #:.1

49. Notwithstanding this grim assessment, from January 18, 2001 through January 26, 2001, Plaintiff stayed at home all day, near the telephone, in hopes that Schiesser would call or finally deliver her household goods.

50. On January 20, 2001, when her sister could substitute the vigil, Plaintiff went to the Salem Police Department to file a report. She was told that a report must be filed at the point of origin where the crime was committed; so, Plaintiff reported her stolen goods to the Scottsdale Police Department. Detective John Barto of the Fraud Division, Scottsdale Police Department, was assigned to Plaintiff's case.

51. Over the next few days, Plaintiff took numerous steps to try and protect herself from any further theft of her assets or identity. She closed her Seattle bank accounts; checked for any suspicious activity on her account in Scottsdale; and alerted credit agencies of the disappearance of her entire household goods shipment.

52. On January 26, 2001 Salem DOT advised Plaintiff that another spelling had been found for Schiesser. New spelling was Schiesses.

53. On February 12, 2001, Plaintiff's attorney was contacted by Rand Walker of National's Safety Division who stated that the theft felt "strange," and that they had used Schiesser before. National still provided no information about the location of Plaintiff's goods, or how National intended to resolve the situation.

54. On March 5, 2001, Plaintiff received a telephone call from Detective John Barto of the Scottsdale Police Department that Schiesser had been located in Texas. Schiesser promised to deliver Plaintiff's property by the end of the week, March 9, 2001.

209080/0001/617563/Version #:.1

## National Fails To Assist Plaintiff In Recovering Her Goods

55.     On or before March 5, 2001, Detective Barto also informed National that he had located Schiesser in Texas.

56.     Plaintiff contacted the Oregon DOT who offered to provide personal protection to Plaintiff and to take pictures in anticipation of the delivery. Plaintiff was told by the DOT not to pay for the shipment when it arrived.

57.     On March 9, 2001, Plaintiff's shipment was NOT delivered for a third promised time by Schiesser and National.

58.     National had been informed that another employee or affiliate of Apex, Bret West, was willing to locate, pick up, and deliver Plaintiff's household goods. West quoted a price to National, but National refused. Rejecting an opportunity to secure Plaintiff's goods and finally fulfill its obligation to deliver them, National refused to pay West the requested additional amount for pick-up and delivery of Plaintiff's household goods, now 64 days overdue.

59.     On March 14, 2001, Plaintiff placed two calls to Maureen Beale, President of National in Broadview, Illinois seeking information on National's inability to procure Plaintiff's property from Schiesser and make delivery to her. President Beale failed to return both telephone calls from Plaintiff.

60.     After having been entrusted with all Plaintiff's worldly possessions, National placed them in the hands of an unlicensed agent who disappeared with them. After losing all control of Plaintiff's shipment, National did nothing to assist Plaintiff in locating or securing delivery of her goods.

209080/0001/617563/Version #:.1

**Plaintiff Locates Her Goods With No Help From National**

61.     On March 18, 2001 Plaintiff's sister was contacted by telephone by a private citizen, Diane Wallace, in Weatherford, Texas. Wallace stated that Plaintiff's household goods appeared to be in the garage of Wallace's mother, Nancy Hawkins. Plaintiff returned the call to Wallace that evening.

62.     Wallace informed Plaintiff that on or about January 1, 2001, Schiesser had been evicted from Hawkins' home for non-payment of rent and destruction to property. Schiesser unloaded Plaintiff's household goods in Hawkins' garage on January 8, 2001.

63.     Wallace further informed Plaintiff that in the latter part of January 2001 Hawkins regained possession of her house from the local sheriff. The sheriff inquired about the contents in the garage. Hawkins believed it all belonged to her evicted tenant, Dwayne Schiesser. Sheriff offered to remove the contents from the garage to auction at their next sheriff's sale. Hawkins turned down the sheriff's offer.

64.     Schiesser had made several telephone calls in January 2001 to Hawkins telling her he wanted to come by and pick up "his" property that he had left behind in her garage. Schiesser's wife also called Hawkins, asking if Hawkins would take tires and other items left in the garage as partial payment for his arrears in the rent. Hawkins refused. Schiesser called several times, each time promising to come, but never came to pick up "his" property from Hawkins' garage.

65.     Hawkins completed the needed work on her home on March 17, 2001 and moved in. She needed her garage, still cluttered with the boxes, furniture, and other items Schiesser had delivered there on or about January 8, 2001.

66.     Wallace arrived at her mother's home to organize a garage sale and began to unload the boxes. In a box of crystal items, Wallace came upon a personal note and became instantly aware the household goods did not belong to Schiesser. Wallace unloaded four more boxes before she came upon information identifying the rightful owner, Plaintiff.

67.     On March 19, 2001, Hawkins advised Plaintiff that approximately 40 boxes, furniture, and other unboxed items had been left in her garage. Plaintiff's inventory had 110 boxes plus furniture and other unboxed items.

68.     On March 20, 2001, on information obtained from Wallace, Detective Barto instructed the manager of Ash Creek Storage in Azle, Texas to enter storage unit #356 rented by Schiesser and report its contents. Plaintiff received a telephone call from Detective Barto and advised that none of Plaintiff's property was found in the unit.

69.     Through her attorney, Plaintiff requested from National a round trip ticket to Weatherford, Texas for herself and for her son to examine the goods in Hawkins' garage. Plaintiff wanted shipped to her only the property that belonged to her and her son, nothing more, nothing less.

70.     Rand Walker of National's Safety Division was adamant and refused to purchase an air fare for Plaintiff and her son to travel to Weatherford, Texas to identify her household goods, now 77 days overdue.

71.     Plaintiff's counsel insisted that National reimburse Plaintiff's air fare, and received support for her request from Oregon Senator Ron Wyden's office.

72.     National's Walker responded to Senator Wyden's office and agreed to pay a round trip air fare only for the Plaintiff. National advised that a private investigator would accompany Plaintiff to conduct the on-site investigation. In reliance on National's representations, Plaintiff

209080/0001/617563/Version #:.1

purchased the most reasonable 2-week advance air fares, in order to mitigate expenses to National. Despite National's agreement to pay, National never reimbursed Plaintiff for the fare nor provided a private investigator as promised.

73.　On April 6, 2001, Plaintiff traveled to Dallas-Ft.Worth Airport, met her son, who traveled from Los Angeles to Dallas-Ft. Worth Airport. Plaintiff rented an automobile and drove with her son to three different addresses in an attempt to locate all her household goods.

74.　On April 7, 2001, Plaintiff examined her belongings that had been found in the garage of Nancy Hawkins. Plaintiff noted damages to electronic equipment and other items not packed in boxes, and the loss of other property. Plaintiff also found items belonging to other shippers.

75.　Plaintiff contacted the assigned National representative on his cell phone, since he had not previously contacted Plaintiff as promised in National's letter to Senator Wyden. National's representative never returned the telephone call nor appeared to assist Plaintiff in the final transport plans of her household goods to Salem, Oregon.

76.　Plaintiff returned to Salem, Oregon on April 8, 2001.

77.　On April 22, 2001, after 112 days (approximately 4 months), Plaintiff's household goods were finally delivered.

78.　Plaintiff experienced a severe hysterical, hyperventilating reaction upon the appearance of the marked National Van Lines truck. National's agent was taken aback by Plaintiff's reaction and waited for Plaintiff to calm herself before proceeding to unload her household goods. After unloading was completed, after 9 p.m., National's agent told Plaintiff there was no charge for the delivery, upon instructions from National's headquarters.

209080/0001/617563/Version #:.1

79.    National has a delay compensation policy, which provides for compensation to a customer of 100% of reasonable hotel costs, as well as 50% of food costs, not including alcohol and tobacco, incurred by the customer as a result of National's or its agents' untimely delivery (unreasonable dispatch) of the customer's shipment.

### Plaintiff Has A Severe Emotional Reaction To The Sight Of Her Stolen Goods

80.    The next day, on April 23, 2001, Plaintiff arrived at her storage unit where delivery had been made.  Her emotional reaction became so severe that Plaintiff could not examine her goods.  Plaintiff closed the storage door, locked it, and returned home.

81.    Plaintiff visited her personal physician on April 24, 2001, for what was ultimately diagnosed as severe post-traumatic stress.

82.    From April 25, 2001 until May 13, 2001, Plaintiff returned to the storage unit on a limited basis.  She examined her household goods for loss and damage as she was able each day.  When the task became too stressful, she closed the storage door, locked it, and returned only when she was emotionally stable to continue the inventory.

83.    Because of National's actions and the actions of its agents, Plaintiff has incurred specific and general damages, including deprivation for four months of literally all the tools of her trade, material belongings, great inconvenience, severe emotional distress, and mental anguish.

### National Delays and Ultimately Refuses To Pay Plaintiff's Claim

84.    On May 16, 2001, Plaintiff's attorney filed a formal claim with National.

85.    National advised Plaintiff's attorney by letter on May 21, 2001 that the claim had been sent to Vanliner, Inc., National's insurance carrier in Fenton, Missouri.  The reason given was the "size of the Plaintiff's claim."

86. Plaintiff heard nothing for almost two months. On July 5, 2001, Plaintiff's attorney sent a letter to Vanliner inquiring about National's near two-month delay in responding to the formal claim.

87. On July 6, 2001 Plaintiff's attorney sent a letter to National's second insurance company in Portland, Oregon, inquiring about their near two-month delay in responding to the formal claim.

88. Defendant National failed to inform Plaintiff of the status of her claim within the 60 days mandated by Federal regulations.

89. On July 31, 2001, Plaintiff's attorney received a letter from VanLiner requesting that enclosed forms be completed on those items lost and damaged in Plaintiff's shipment. Plaintiff had already submitted this information.

90. On August 23, 2001, Plaintiff's attorney received a letter from VanLiner, with an offer of settlement for the claim for damaged and lost goods only. Vanliner advised that Plaintiff's attorney must deal directly with National to address all other claims. However, in National's letter of May 21, 2001, National implied that the entire claim would be handled by its insurance company "due to the size of the claim."

91. On September 5, 2001, Plaintiff's attorney wrote to National demanding payment with no further delays.

92. Plaintiff's attorney received no response for almost a month. On October 2, 2001, National responded that "they will review within the next two to three weeks."

93. On October 12, 2001, Plaintiff's was sent a settlement offer. For the first time, National indicated that it was rejecting a portion of Plaintiff's claim. Again, National violated

209080/0001/617563/Version #:.1

the Code of Federal Regulations (Part 370.9) regarding disposition of claims within 120 days. Plaintiff learned of this denial in November of 2001.

**COUNT I**
**BILL OF LADING - BREACH OF CONTRACT**
(Against National Van Lines)

94.     Paragraphs 1 through 93 are incorporated herein by reference.

95.     National entered into a valid contract with Plaintiff.

96.     This contract is embodied in the Order For Service--Registration (Exhibit A), Authorized Change To Order For Service (OFS) (Exhibit B), Household Goods Bill of Lading and Freight Bill, Number 125330 (Exhibit C), Household Goods Descriptive Inventory (Exhibit D), and Packing and Accessorial Service Report (Exhibit E).

97.     Plaintiff performed all conditions of the contract; she was available to accept delivery and willing and prepared to make payment by certified check when the truck carrying her property was due to arrive in the Delivery Spread from 12-30-00 to 1-10-01.

98.     National is in direct breach and violation of the contract by failing to make delivery by January 10, 2001.

99.     National is liable to Plaintiff for its failure to procure and deliver Plaintiff's property.

100.    National is liable for the actual theft and abandonment of Plaintiff's property.

101.    National's actions resulted in Plaintiff's injury as described herein.

WHEREFORE, Plaintiff, Sofia Schwarz, prays for judgment against Defendant National and for relief as follows:

(a) Award for damages for the actual damage and loss of Plaintiff's property in an amount to be determined by a jury;

209080/0001/617563/Version #:.1

(b) Award for punitive damages for Defendant's improper demands for advance payment under the Bill of Lading and failure to appear with Plaintiff's property on three promised delivery dates;

(c) Award for damages in the amount not less than 100% of Plaintiff's apartment bills and 50% of Plaintiff's meals for the time period of January 10, 2001 through April 22, 2001, and all additional costs due to the delay in Plaintiff's shipment incurred before and since April 22, 2001;

(d) Award for all other incidental and consequential damages which resulted from Defendant's breach of contract including, but not limited to, loss of income;

(e) Award for attorneys' fees and costs; and

(f) For such and further relief as the Court deems just and proper.

## COUNT II
## CONVERSION
(Against National Van Lines)

102.    Paragraphs 1 through 93 are incorporated herein by reference.

103.    Plaintiff was ready and willing to pay Defendant the charges for her move upon delivery of her property.

104.    National or its agents wrongfully assumed and maintained control and dominion over Plaintiff's property by unloading the contents in the garage of Schiesser's private residence.

105.    Plaintiff had the right to expect delivery and possession of her property under the Bill of Lading agreement.

106.    Plaintiff continuously sought, through various inexhaustible legal means, to trace and retrieve and obtain possession of her property.

107.    National's agent, Schiesser, converted Plaintiff's property for his own use when he offered it to Nancy Hawkins in partial payment of his rent.

108.    National and its agents placed Plaintiff's property in peril of a sheriff's sale, two pawn shops, and a scheduled garage sale in Weatherford, Texas and did nothing to locate or secure Plaintiff's shipment once it disappeared. Plaintiff only regained possession of her

property through her own efforts and the efforts of the Scottsdale Police Department and two private citizens of Weatherford, Texas.

WHEREFORE, Plaintiff, Sofia Schwarz, prays for judgment against National and for relief as follows:

(a) An award for damages based upon Defendant's wrongful deprivation of plaintiff's property;

(b) An award of attorneys' fees and costs; and

(c) For such and further relief as the court deems just and proper.

## COUNT III
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
(Against National Van Lines)

109.    Paragraphs 1 through 93 are incorporated herein by reference.

110.    National failed to protect Plaintiff's property from conversion and abandonment, by contracting with agents Apex and Schiesser, knowing that such agents held no valid licensing, permitting or insurance, as required by Federal regulation, and further knowing that on numerous other occasions said agents had been in breach and violation of their duties with prior customers.

111.    National and/or its agents lost complete control of Plaintiff's property when they allowed Schiesser to load and haul Plaintiff's household goods in an unmarked vehicle, bearing no National insignias and no DOT identifying numbers. Schiesser then stole Plaintiff's goods from interstate shipment, transported her stolen goods across state lines, and unloaded them into his personal garage.

112.    Plaintiff had every lawful right to expect safekeeping and delivery of her property by National and its agents in their professional fiduciary capacity.

113.    For over two months, National took no action to discover the whereabouts of Plaintiff's goods. Then, when an individual affiliated with Apex offered to deliver the goods for

19

an additional price, National still failed to take any action to secure the safety of Plaintiff's goods.

114.    National and its agents failed to protect Plaintiff's property from a sheriff's sale, pawn shops, and scheduled garage sale, all occurring in Weatherford, Texas.

115.    Although National represented to Senator Wyden's office that it would send a representative to Weatherford, Texas to assist Plaintiff in assembling her property for final delivery to Salem, Oregon, it failed to do so.

116.    Although National further represented to Senator Wyden's office that it would reimburse Plaintiff for the cost of her travel to Weatherford, Texas to inspect her goods, it refused to purchase her a ticket and has failed to reimburse her for her expenses.

117.    Plaintiff traveled at her own expense to Weatherford, Texas to recover her abandoned property and those of her son from the garage of the private citizen.

118.    National then engaged in a process of delaying payment on Plaintiff's claim, giving Plaintiff the run-around on when and how her claims would be addressed, all the while providing assurances to Plaintiff. In this regard, National's conduct violated several federal regulations.

119.    Ultimately, and despite a ten-month effort to mislead Plaintiff about the status of her shipment and the status and disposition of her claim, on October 12, 2001, National unilaterally and unconscionably denied Plaintiff's claim and insisted that Plaintiff pay the full charge for her move out of the money National admittedly owed her under its own delay compensation policy.

120.    This systemic pattern of outrageous conduct led to a continuing injury to Plaintiff. When Plaintiff learned of National's October denial of her claim, she suffered severe and

    209080/0001/617563/Version #:.1

immediate symptoms of emotional distress. The cumulative effect of National's conduct was to cause Plaintiff to suffer from nightmares and sleeplessness and loss of appetite. She also became severely depressed, was filled with despair, and lost her ability to enjoy life.

121.    National's conduct and that of its agents was extreme, outside all bounds of decency by failing to fulfill its promises and mitigate their egregious errors made upon the Plaintiff.

122.    As a direct and proximate result of National's conduct and that of its agents, Plaintiff suffered severe emotional distress.

WHEREFORE, Plaintiff, Sofia Schwarz, prays for judgment against Defendant National and for relief as follows:

(a) Award of damages to compensate her for emotional distress caused by National and its agents, said amount to be determined by a jury;
(b) Award of punitive damages;
(c) Award of attorneys' fees and costs; and
(d) For such and further relief as the Court deems just and proper.

## COUNT IV
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
(Against National Van Lines)

123.    Plaintiff incorporates by reference the allegations of paragraphs 1 through 93 of the Complaint as though fully set forth herein.

124.    National failed to protect Plaintiff's property from conversion and abandonment by negligently contracting with agents Apex and Schiesser, knowing that such agents held no valid licensing, permitting or insurance, as mandated by Federal regulations, and further knowing that on numerous other occasions said agents had been in breach and violation of their duties with prior customers.

125. National had a duty to exercise reasonable care in obtaining and verifying, through Department of Transportation data, the status of Apex's and Schiesser's compliance before permitting them to possess and move Plaintiff's goods.

126. National had a duty to stay in communication with Apex and Schiesser while Plaintiff's goods were in their possession.

127. National breached its duties and committed negligent acts upon Plaintiff including, but not limited to, by

(a) negligently refusing or failing to obtain an updated Department of Transportation Federal record on Apex and/or Schiesser prior to giving them access to and possession of Plaintiff's goods;

(b) losing total and complete communication with and control of Apex and Schiesser;

(c) failing forever to discover the location of the entire lost shipment of Plaintiff's goods and procuring same for delivery;

(d) promising three separate dates to deliver Plaintiff's household goods and failing forever on all three separate delivery dates;

(e) proclaiming "No Charge" on delivery of discovered goods in April 2001, only to renege on such proclamation by deducting said delivery charges from the amount National admittedly owed Plaintiff under its own delay compensation policy.

128. As a direct and proximate result of one or more of the negligent acts committed by National, Plaintiff sustained severe emotional distress as previously set forth.

WHEREFORE, Plaintiff, Sofia Schwarz, prays for judgment against Defendant National and for relief as follows:

(a) Award of damages to compensate her for emotional distress caused by National, said amount to be determined by a jury;
(b) Award of punitive damages;
(c) Award of attorneys' fees and costs; and
(d) For such and further relief as the court deems just and proper.

209080/0001/617563/Version #:.1

## COUNT V
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
(Against National Van Lines)

129. Plaintiff incorporates by reference the allegations of paragraphs 1 through 93 of the Complaint as though fully set forth herein.

130. National entered into a valid agreement with Plaintiff.

131. National and its agents had an implied obligation under the contract terms to cooperate fully with Plaintiff so that she could receive the full benefit of her agreement for delivery of her property no later than January 10, 2001.

132. Plaintiff acted in good faith so as to allow National to receive the benefits that flowed from the agreement by being available to accept delivery and willing and prepared to make payment by certified check when the truck carrying her property was expected to arrive in Salem, Oregon between December 30, 2000 and January 10, 2001.

133. National and its agents acted in bad faith when they impaired Plaintiff's right to receive the benefits that flowed from the agreement by failing to make delivery by January 10, 2001, failing to engage in diligent efforts to locate and recover Plaintiff's stolen property, and engaging in a ten-month effort to mislead Plaintiff about the status of her shipment and the status and disposition of her claim.

134. Plaintiff's right to receive the benefits of the agreement was impaired as a result of the actions of National and its agents.

WHEREFORE, Plaintiff, Sofia Schwarz, prays for judgment against Defendant National and for relief as follows:

(a) Award of damages for the actual damage and loss of Plaintiff's property in an amount to be determined by a jury;

209080/0001/617563/Version #:.1

(b) Award for punitive damages for Defendant's improper demands for advance payment under the Bill of Lading and failure to appear with Plaintiff's property on three promised delivery dates;

(c) Award for damages in the amount not less than 100% of Plaintiff's apartment bills and 50% of Plaintiff's meals for the time period between January 10, 2001 through April 22, 2001, and all additional expenses due to the delay in Plaintiff's shipment incurred before and since April 22, 2001;

(d) Award for all other incidental and consequential damages which resulted from Defendant's actions that impaired the right of Plaintiff to receive the benefits which flowed from their agreement including, but not limited to, loss of income;

(e) Award of attorneys' fees and costs; and

(f) For such and further relief as the Court deems just and proper.

## COUNT VI
## CONSTRUCTIVE FRAUD BASED ON BREACH OF FIDUCIARY DUTY
(Against National Van Lines)

135. Plaintiff incorporates by reference the allegations of paragraphs 1 through 93 of the Complaint as though fully set forth herein.

136. National had a fiduciary relationship with Plaintiff whereby National induced Plaintiff to rely on National, Central, Apex, and Schiesser to safely transport her property from Scottsdale, Arizona to Salem, Oregon.

137. National owed a fiduciary duty to Plaintiff to deal fairly with her and to fully disclose all material facts regarding the safe transport and prompt delivery of her property to Salem, Oregon.

138. National breached its fiduciary duty by fraudulently deceiving Plaintiff that her property was safely being transported from Scottsdale, Arizona to Salem, Oregon by a properly licensed moving agent, that she would receive her property promptly on January 10, 2001, and by failing to engage in diligent efforts to efforts to locate and recover Plaintiff's stolen property.

139. National's breach of fiduciary duty resulted in Plaintiff's injury as described herein.

WHEREFORE, Plaintiff, Sofia Schwarz, prays for judgment against Defendant National and for relief as follows:

209080/0001/617563/Version #:.1

(a) Award of damages to compensate her for Defendant's breach of its fiduciary duty by fraudulently deceiving Plaintiff;
(b) Award of punitive damages;
(c) Award of attorneys' fees and costs; and
(d) For such and further relief as the Court deems just and proper.

## COUNT VII
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
(Against Defendant Schiesser)

140. Plaintiff incorporates by reference the allegations of paragraphs 1 through 93 of the Complaint as though fully set forth herein.

141. Schiesser is a "person" within the meaning of 18 U.S.C. § 1962(c).

### Enterprise - Apex

142. At times relevant to this lawsuit, Apex, was a Texas corporation providing interstate shipping of household goods, both as a disclosed agent of National and on its own behalf.

143. On information and belief, Apex was owned and/or operated by Dwayne Schiesser, also known by the alias Dwayne Schiesses.

144. Schiesser participated in the management and/or operation of Apex in numerous ways including marketing and selling moving services, loading, unloading, and transporting goods, responding to claims of loss or damage, and generally managing the affairs of the corporation.

145. At times relevant to this lawsuit, Apex was an enterprise engaged in interstate commerce within the meaning of 18 U.S.C. § 1962(c).

### Pattern of Racketeering Activity

146. Schiesser engaged in a pattern of racketeering activity consisting of predicate acts of theft from interstate shipment (in violation of 18 U.S.C. § 659), and transportation of stolen goods (in violation of 18 U.S.C. § 2314).

209080/0001/617563/Version #:.1

147. Plaintiff's household goods constituted an interstate shipment.

148. The value of Plaintiff's goods exceeded $5,000.

149. After loading virtually all Plaintiff's belongings into an unmarked truck, Schiesser unlawfully stole and carried away Plaintiff's goods, transported them across state lines, and unloaded them into the garage of his rented house.

150. Schiesser intended to convert Plaintiff's belongings to his own use when he offered Plaintiff's property to Nancy Hawkins in partial payment for the rent he owed to her.

151. Schiesser engaged in a pattern of similar and related acts of theft from interstate commerce and transportation of stolen property with respect to numerous other shippers who entrusted Apex with their household goods for purposes of interstate shipment and storage.

152. Similar predicate acts were committed by Schiesser with respect to the interstate shipments of a presently unknown number of shippers, including but not limited to Kris Hodges, Ramana Kondaveeti, Bala Gampa, Shanera Gonzales, Tonya Cannon, Chris Gallo, Vichian Kitchaiya, Christine Liebhart, Susan Dallas, Kim & Jeremy Goodell, Terry Wagner, Kamal Alwani, Morgan Moore, Nick Waymire, Susan Heffern, and Jason & Julie Miller (the "RICO victims").

153. In each instance, the RICO victims entrusted Apex with their household goods so that they could be transported across interstate lines. Rather than deliver the goods as promised, Schiesser unlawfully took or carried away some or all of the shipment with the intent to convert such goods to his own use.

154. In many instances, portions of the RICO victims' goods were delivered weeks or months later than promised, in poor condition, and missing expensive items such electronics, furniture, and computer equipment.

209080/0001/617563/Version #:.1

155. In several instances, Schiesser, without authorization, placed the RICO victims' goods into storage, either in his own garage (as in Plaintiff's case), or in a public storage unit to which the RICO victim could not gain access since it had been opened in the name of Apex or an individual associated with the enterprise.

156. Such predicate acts occurred at least over a two and a half year period, from September 1998 through April 2001.

157. In addition, on information and belief, Schiesser engaged in additional related predicate acts in furtherance of a scheme to steal goods from interstate shipment and transport such stolen goods across interstate lines. Information relating to such additional predicate acts and victims is exclusively within the control of Schiesser, Apex, and National.

158. Schiesser and other employees or affiliates of Apex also conspired to violate 18 U.S.C. § 1962(c) by entering into an agreement that someone within the Apex enterprise would commit at least two predicate acts in furtherance of the pattern of racketeering activity.

159. The Plaintiff has suffered loss of property and other incidental and consequential damages as a result of the racketeering activity and the conspiracy to commit racketeering activity.

160. Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to triple damages and attorneys' fees.

WHEREFORE, Plaintiff Sofia Schwarz prays for judgment against Defendants Schiesser and National (pursuant to 49 U.S.C. § 13907), and for relief as follows:

    (a)    An award of damages to compensate her for her loss of property and other incidental and consequential damages including, but not limited to, lost income and emotional distress;

    (b)    Statutory treble damages;

    (c)    An award of attorneys' fees and costs; and

    (d)    For such further relief as the Court deems just and proper.

**COUNT VIII**
**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
(Against Defendants Schiesser and Apex)

161. Plaintiff incorporates by reference the allegations of paragraphs 1 through 93 of the Complaint as though fully set forth herein.

162. At all relevant times, Apex and Schiesser were "persons" within the meaning of 18 U.S.C. § 1962(c).

**Enterprise – AAAA Enterprise**

163. On information and belief, in addition to Apex, Schiesser owned and/or operated several other companies that also provided household goods moving and other related services. Such companies included Able Bodied Movers, Inc. ("Able Bodied"), Accent Movers, Inc. ("Accent"), and Astro Movers ("Astro").

164. Apex, Able Bodied, Accent, Astro and various other moving companies, associated together on an ongoing basis and were joined in the common goal of marketing, booking, packing, hauling, storing, and delivering shipments of household goods.

165. At times relevant to this lawsuit, Apex, Able Bodied, Accent, and Astro together constituted an enterprise engaged in interstate commerce within the meaning of 18 U.S.C. § 1962(c) (the "AAAA Enterprise").

166. Apex participates in and/or has agreed to facilitate the operation and management of the Enterprise by providing all of the following services at various times:  interstate shipping services, billing and collections, storage, handling claims for loss or damage, and providing the interstate shipping authority under which it and other members of the Enterprise operate.

167. Schiesser participated in the management and/or operation of the AAAA Enterprise in numerous ways including marketing and selling moving services, loading, unloading, and

209080/0001/617563/Version #:.1

transporting goods, responding to claims of loss or damage, and generally managing the affairs of the AAAA Enterprise.

### Pattern of Racketeering Activity

168. Schiesser and Apex each engaged in a pattern of racketeering activity consisting of predicate acts of theft from interstate shipment (in violation of 18 U.S.C. § 659), and transportation of stolen goods (in violation of 18 U.S.C. § 2314).

169. Plaintiff's household goods constituted an interstate shipment.

170. The value of Plaintiff's goods exceeded $5,000.

171. After loading virtually all Plaintiff's belongings into an unmarked truck, Schiesser and Apex unlawfully stole and carried away Plaintiff's goods, transported them across state lines, and unloaded them into the garage of Schiesser's rented house.

172. Schiesser and Apex intended to convert Plaintiff's belongings to their own use.

173. Schiesser and Apex each engaged in a pattern of similar and related acts of theft from interstate commerce and transportation of stolen property with respect to numerous other shippers who entrusted Apex or another member of the AAAA Enterprise with their household goods for purposes of interstate shipment and storage.

174. Similar predicate acts were committed by Apex and/or Schiesser with respect to the interstate shipments of a presently unknown number of shippers, including but not limited to the RICO victims.

175. In each instance, the RICO victims entrusted Apex or another member of the AAAA Enterprise with his or her household goods so that they could be transported across interstate lines. Rather than deliver the goods as promised, Apex and/or Schiesser unlawfully took or carried away some or all of the shipment with the intent to convert such goods to their own use.

209080/0001/617563/Version #:.1

176. In many instances, portions of the RICO victims' goods were delivered weeks or months later than promised, in poor condition, and missing expensive items such electronics, furniture, and computer equipment.

177. In several instances, Apex and/or Schiesser, without authorization, placed the RICO victims' goods into storage, either in his own garage (as in Plaintiff's case), or in a public storage unit to which the RICO victim could not gain access since it had been opened in the name of Apex or an individual associated with the enterprise.

178. Such predicate acts occurred at least over a two and a half year period, from September 1998 through April 2001.

179. In addition, on information and belief, Apex and/or Schiesser engaged in additional related predicate acts in furtherance of a scheme to steal goods from interstate shipment and transport such stolen goods across interstate lines. Information relating to such additional predicate acts and victims is exclusively within the control of Schiesser, Apex, and National.

180. Schiesser, Apex, and other employees or affiliates of the AAAA Enterprise also conspired to violate 18 U.S.C. § 1962(c) by entering into an agreement that someone within the AAAA Enterprise would commit at least two predicate acts in furtherance of the pattern of racketeering activity.

181. The Plaintiff has suffered loss of property and other incidental and consequential damages as a result of the racketeering activity and the conspiracy to commit racketeering activity.

182. Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to triple damages and attorneys' fees.

WHEREFORE, Plaintiff Sofia Schwarz prays for judgment against Defendants Schiesser, Apex, and National (pursuant to 49 U.S.C. § 13907), and for relief as follows:

(a) An award of damages to compensate her for her loss of property and other incidental and consequential damages including, but not limited to, lost income and emotional distress;

(b) Statutory treble damages;

(c) An award of attorneys' fees and costs; and

(d) For such further relief as the Court deems just and proper.

## Jury Demand

Plaintiff hereby provides notice pursuant to Rule 38(b) of the Federal Rules of Civil Procedure of her request that this matter be tried to a jury on all issues.

Dated: November 14, 2003

Respectfully submitted,

By: _____

One of the Attorneys for
Plaintiff, Sofia Schwarz

José A. Isasi, II
Carey L. Bartell
Sachnoff & Weaver, Ltd.
30 S. Wacker Drive, Suite 2900
Chicago, Illinois 60606
(312) 207-1000

209080/0001/617563/Version #:.1

# SEE CASE FILE FOR EXHIBITS