# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Amy J. St. Eve | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 7096 | **DATE** | 5/20/2004 |
| **CASE TITLE** | Schwartz vs. National Van Lines | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant National's motion to dismiss is granted in part and denied in part. It is granted with respect to counts II, V, VI, VII and VIII. Plaintiff has until June 4, 2004 to file an amended complaint consistent with the Court's opinion.

(11) ■ [For further detail see order attached to the original minute order.]

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SOFIA SCHWARZ, | ) |
|     Plaintiff, | ) ) ) |
| v. | ) Case No. 03 C 7096 ) |
| NATIONAL VAN LINES, INC., DWAYNE SCHIESSER, and APEX RELOCATION SPECIALISTS, INC., | ) ) ) ) |
|     Defendants. | ) ) |

DOCKETED
MAY 2 1 2004

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff Sofia Schwarz filed an amended complaint against Defendants National Van Lines, Inc. ("National"), Dwayne Schiesser, and Apex Relocation Specialists, Inc. ("Apex"), alleging breach of contract by National under 49 U.S.C. § 14706 (the "Carmack Amendment") (Count I), conversion by National (Count II), intentional infliction of emotional distress by National (Count III), negligent infliction of emotional distress by National (Count IV), breach of the implied covenant of good faith and fair dealing by National (Count V), constructive fraud based on breach of fiduciary duty by National (Count VI), and statutory claims under Section 1961 of the Racketeer Influenced and Corrupt Organizations Act ("RICO") against Schiesser and Apex (Counts VII and VIII). This Court has already denied Defendant National's motion to transfer venue pursuant to 28 U.S.C. § 1404(a). National now submits a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons stated herein, Defendant's motion is granted in part and denied in part.



# BACKGROUND

Plaintiff is a citizen of the United States and resides in Oregon. (R. 3-1, Pl.'s First Am. Compl. ¶ 1.) Defendant National is an Illinois corporation engaged in the business of transporting household goods. (*Id.* ¶ 2.) Defendant Schiesser is a United States citizen and resident of Texas. (*Id.* ¶ 3.) Defendant Apex is a defunct Texas corporation that provided interstate shipping of household goods as an agent of National and on its own behalf. (*Id.* ¶¶ 4, 48.)

## I.  Schwarz's Move from Scottsdale to Salem

In December of 2000, Plaintiff hired Central Moving & Storage ("Central"), a disclosed agent of National, to move her household items from Scottsdale, Arizona to Salem, Oregon. (R. 3-1, Pl.'s First Am. Compl. ¶¶ 11-17.) Plaintiff signed an Order for Service-Registration form calling for pickup of her goods between December 27 and December 30, 2000 and delivery between December 30, 2000 and January 10, 2001. (*Id.* ¶¶ 13-17.) Plaintiff also agreed to pay a $35.00 charge for extra protection under "Option A – Replacement Value Protection (Min. $3.50 lb.), No Claim Deductible." (*Id.* ¶ 16.)

From December 27 to December 30, Plaintiff waited at her residence in anticipation of the moving van. (*Id.* ¶¶ 18-21.) After multiple phone calls among Plaintiff, Central, and Defendant Schiesser, Schiesser arrived at Plaintiff's home at 3:00 p.m. on December 31 in an unmarked van. (*Id.* ¶¶ 19-28.) After asking Plaintiff to sign the Household Goods Bill of Lading and Freight Bill and filling in a $100 discount for the late arrival, Defendant Schiesser asked Plaintiff for a $400 cash advance. (*Id.* ¶¶ 30-31.) Concerned that Schiesser might try to sell her goods, Plaintiff filled in an amount of $25,000 as the value of her goods. (*Id.* ¶ 32.)

2

On January 9, 2001, Plaintiff attempted to call Defendant Schiesser to confirm delivery of her goods. (*Id.* ¶ 38.) Defendant Schiesser's phone number had been disconnected. (*Id.*) No one appeared on January 10, 2001 at Plaintiff's new residence to deliver her goods. (*Id.* ¶ 39.)

## II.      Plaintiff's Attempts to Retrieve Her Goods

From January 9 through January 16, 2001, Plaintiff repeatedly called Central and Defendant National to inquire about the status of her delivery. (*Id.* ¶ 41.) Central and National initially assured Plaintiff that her shipment was still scheduled for delivery on January 10. (*Id.*) On January 16, Defendant Schiesser left a message for Plaintiff promising to call again the next day, but he did not call. (*Id.* ¶¶ 44-45.) On January 18, 2001, National contacted Plaintiff's attorney and advised that he would send Claims Forms to file for the loss of the entire shipment. (*Id.* ¶ 47.) On January 19, Plaintiff contacted the Salem, Oregon Department of Transportation and discovered that Defendant Schiesser was associated with Defendant Apex. (*Id.* ¶ 48.) She also discovered that Apex carried no required interstate insurance, that its common carrier status was revoked, it had numerous cancellations of insurance, and its telephone numbers had been disconnected. (*Id.*) From January 18 through January 26, Plaintiff stayed at home waiting for a call from Schiesser. (*Id.* ¶ 49.) On January 20, Plaintiff spoke with the Salem Police Department and ultimately reported to the Scottsdale Police Department that her goods were stolen. (*Id.* ¶ 50.) On March 5, 2001, the Scottsdale Police Department called Plaintiff to inform her that it had located Schiesser in Texas. (*Id.* ¶ 54.) Schiesser promised to deliver the shipment by March 9. (*Id.*)

## III. Recovering Plaintiff's Goods

Plaintiff contacted the Oregon Department of Transportation ("DOT"), and the DOT offered personal protection, offered to take photographs, and told Plaintiff not to pay for the shipment on arrival. (*Id.* ¶ 56.) Schiesser did not appear on March 9. (*Id.* ¶ 57.)

On or before March 5, 2001, the Scottsdale Police Department informed National that it had located Schiesser. (*Id.* ¶ 55.) Bret West, an affiliate of Apex, contacted National and offered to locate and deliver Plaintiff's goods, but National refused. (*Id.* ¶ 58.) On March 14, 2001, Plaintiff called National to inquire about National's inability to deliver her goods, but received no answer. (*Id.* ¶ 59.)

On March 18, 2001, a private citizen living in Texas called Plaintiff's sister and informed her that she had found some of Plaintiff's household goods in her mother's garage. (*Id.* ¶¶ 61, 67.) The private citizen, Diane Wallace, explained that her mother's former tenant, Dwayne Schiesser, had left the goods in the garage on January 8, 2001. (*Id.* ¶ 62.) After Wallace's mother evicted Defendant Schiesser, Schiesser never returned to pick up the goods he had left behind. (*Id.* ¶¶ 62-65.) In January of 2001, Schiesser's wife offered the goods as partial payment of overdue rent. (*Id.* ¶ 64.) After Plaintiff requested help from Oregon Senator Ron Wyden's office, National agreed to pay round trip airfare for Plaintiff to inspect and identify the goods in Texas, and agreed to send a representative to meet her. (*Id.* ¶¶ 69-72.) Plaintiff flew to Texas, but National has not reimbursed her for the flight. (*Id.* ¶ 72.) No representative from National contacted Plaintiff during her time in Texas. (*Id.* ¶ 75.)

Plaintiff identified her goods and returned to Oregon. On April 22, 2001, her goods were delivered, though some were damaged and some were missing. (*Id.* ¶¶ 74-77.) When National delivered the goods, its representative told Plaintiff there was no charge for the delivery,

4

according to instructions from National's headquarters. (*Id.* ¶ 78.) National has a delay compensation policy that provides for 100% compensation of reasonable hotel costs and 50% of foods costs incurred by a customer as a result of delayed delivery. (*Id.* ¶ 79.)

## IV. Plaintiff's Emotional Reaction

When the National truck arrived on April 22, 2001, Plaintiff had a "severe hysterical, hyperventilating reaction." (*Id.* ¶ 78.) The next day, Plaintiff visited her storage unit, but had an emotional reaction too severe to allow her to examine her goods. (*Id.* ¶ 80.) On April 24, Plaintiff visited her personal physician, who eventually diagnosed her emotional distress as "severe post-traumatic stress." (*Id.* ¶ 81.) From April 25 to May 13, 2001, Plaintiff examined her goods as much as her condition allowed. (*Id.* ¶ 82.) Plaintiff alleges that she suffered from "nightmares, sleeplessness, and loss of appetite." (*Id.* ¶ 120.) She further alleges that she "became severely depressed, was filled with despair, and lost her ability to enjoy life." (*Id.*)

## V. Plaintiff's Claim with National

On May 16, 2001, Plaintiff's attorney filed a formal claim with Defendant National. (*Id.* ¶ 84.) On May 21, National advised Plaintiff's attorney that it had sent the claim to its insurance carrier, Vanliner, Inc. (*Id.* ¶ 85.) Having heard nothing by July, Plaintiff's attorney sent letters to Vanliner and to National's second insurance carrier. (*Id.* ¶¶ 86-88.) Vanliner requested more information and eventually made a settlement offer for the lost and damaged goods only. (*Id.* ¶¶ 89-90.) On September 5, Plaintiff's attorney wrote to National demanding payment. (*Id.* ¶ 91.) On October 12, 2001, National responded with a settlement offer and indicated that it was rejecting part of Plaintiff's claim. (*Id.* ¶ 93.)

Plaintiff filed her complaint in this Court on October 7, 2003, and filed her amended complaint on November 14, 2003. Defendant National moved to dismiss all eight of Plaintiff's

5

counts, some on the basis of preemption by the Carmack Amendment, and some on the basis that RICO does not support the claims.

## LEGAL STANDARDS

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of a complaint, not the merits of the case. *See Triad Assocs., Inc. v. Chicago Hous. Auth.*, 892 F.2d 583, 586 (7th Cir. 1989). When considering a motion to dismiss, the Court considers "whether relief is possible under [any] set of facts that could be established consistent with [the] allegations." *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992). The Court views the complaint "in the light most favorable to the plaintiff, taking as true all well-pleaded factual allegations and making all possible inferences from those allegations in his or her favor." *Lee v. City of Chicago*, 330 F.3d 456, 459 (7th Cir. 2003); *see also Thomas v. Law Firm of Simpson & Cybak*, 354 F.3d 696, 697 (7th Cir. 2004). Dismissal is appropriate only where it appears beyond doubt that under no set of facts would plaintiff's allegations entitle her to relief. *See Hernandez v. City of Goshen*, 324 F.3d 535, 537 (7th Cir. 2003). The court is not, however, "obliged to accept as true legal conclusions or unsupported conclusions of fact." *Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002).

## ANALYSIS

### I. Carmack Amendment Preemption

Defendants argue that Counts I through VI are common-law and state-law claims preempted by the Interstate Commerce Commission Termination Act of 1995 (the "Act").[1] (R. 13-1, Def.'s Mem. in Supp. of Mot. to Dismiss at 2-4.) Plaintiff argues in response that Count I

---

[1] The I.C.C. Termination Act of 1995 recodifies the Carmack Amendment to the Interstate Commerce Act. Though the substance of the Amendment has been recodified at 49 U.S.C. §§ 14706, it is still referred to as the Carmack Amendment. *See Gordon v. United Van Lines, Inc.*, 130 F.3d 282, 286 (7th Cir. 1997).

is a claim for breach of contract under the Carmack Amendment and that Counts II through VI are not preempted. (R. 18-1, Pl.'s Resp. in Opp'n to Def.'s Mot. to Dismiss at 3-4.)

The Act governs common carrier liability to a shipper for loss of, or damage to, an interstate shipment. *N. Am. Van Lines v. Pinkerton Sec. Sys., Inc.*, 89 F.3d 452, 455 (7th Cir. 1996). Prior to the passage of the Carmack Amendment in 1906, such liability was governed by common law or by state statute. *Id.* In an early examination of the preemptive scope of the Carmack Amendment, the United States Supreme Court emphasized the great need for uniformity of law. *Adams Express Co. v. E.H. Croninger*, 226 U.S. 491, 506 (1913). The Supreme Court held that "[a]lmost every detail of the subject is covered as completely that there can be no rational doubt that Congress intended to take possession of the subject and supersede all state regulation with reference to it." *Id.* at 505. The Seventh Circuit has recognized the Carmack Amendment's purpose of establishing uniform federal guidelines to reduce uncertainty in connection with shippers' liability. *Hughes v. United Van Lines, Inc.*, 829 F.2d 1407, 1415 (7th Cir. 1987).

Though the Carmack Amendment's preemptive scope is broad, Plaintiff correctly notes that it is not all-inclusive. The Carmack Amendment preempts all "state and common law remedies inconsistent with the federal Act." *Id.* (citing *Am. Ry. Express Co. v. Levee*, 263 U.S. 19 (1923). While the Act does preempt "all state law claims based upon the contract of carriage, in which the harm arises out of the loss of or damage to goods," it does not preempt "claims involving a separate and independently actionable harm to the shipper distinct from such damage." *Gordon v. United Van Lines, Inc.*, 130 F.3d 282, 284 (7th Cir. 1997).

The question for this Court is whether each of Plaintiff's common law claims allege liability on grounds separate and distinct from the loss of, or damage to, the shipped household

7

goods. Faced with this question, the Seventh Circuit has held that the Act preempts certain claims for breach of contract, common law fraud, violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, and willful and wanton conduct. *Id.* at 289. On the other hand, the Seventh Circuit has held that the Act did not preempt a claim for intentional infliction of emotional distress. *Id.* It has further explained that the Act may not preempt actions under a statute prohibiting deceptive trade practices, or actions by a shipper against a carrier who assaulted and injured the shipper. *Id.*

### A. Count I – Bill of Lading – Breach of Contract

Defendant National argues that Plaintiff's Count I is a common law claim for breach of contract. (R. 13-1, Def.'s Mem. in Supp. of Mot. to Dismiss at 5.) Defendant further argues that Plaintiff's request for punitive damages shows that Plaintiff did not bring her claim under the Carmack Amendment, because Plaintiff's counsel is aware that the Act does not allow punitive damages. (R. 23-1, Def.'s Reply Br. in Supp. of Mot. to Dismiss at 3.) Though the title of Plaintiff's Count I ("Bill of Lading – Breach of Contract") and Plaintiff's request for punitive damages cloud the issue, Plaintiff's jurisdictional statement makes clear that Count I arises under the Carmack Agreement. (R. 3-1, Pl.'s First Am. Compl. ¶ 6.) Accordingly, the Court holds that Count I is a claim for relief under the Act rather than a common law claim that may be preempted.

Because Count I claims relief under the Carmack Amendment, Plaintiff cannot recover punitive damages. "[N]o federal common law right to punitive damages exists in a Carmack Amendment suit." *Gordon*, 130 F.3d at 286-87 (citing *Cleveland v. Beltman N. Am. Co.*, 30 F.3d 373 (2$^d$ Cir. 1994)). Accordingly, the Court strikes Plaintiff's request for punitive damages under Count I.

8

Defendant argues in its reply that Plaintiff has not alleged the *prima facie* elements of a claim under the Carmack Amendment. (R. 23-1, Def.'s Reply Br. in Supp. of Mot. to Dismiss at 2-3.) To state a prima facie case under the Carmack Amendment, a plaintiff must allege that: 1) the goods in question were delivered to the carrier in good condition; 2) the goods reached the final destination in a damaged or diminished condition; and 3) the damages can be specified. *Pharma Bio, Inc. v. TNT Holland Motor Express, Inc.*, 102 F.3d 914, 916 (7th Cir. 1996). Arguments raised for the first time in a reply brief are waived. In any event, Plaintiff has sufficiently alleged these elements under the liberal pleading requirements of Rule 8.

### B. Count II – Conversion

Preemption of Plaintiff's common law conversion claim depends on whether the claim is independent of the loss of or damage to her goods. *See Gordon*, 130 F.3d at 284. In Illinois, conversion is defined as "any unauthorized act that deprives a person of his or her property either (1) permanently; or (2) for an indefinite period of time." *Chen v. Mayflower Transit, Inc.*, No. 99 C 6261, 2002 WL 1632412, at *14 (N.D. Ill. July 22, 2002). Plaintiff seeks damages "based upon Defendant's wrongful deprivation of Plaintiff's property," highlighting Defendants' various acts of mishandling the goods. (R. 3-1, Pl.'s First Am. Compl. p. 18-19.) Like the claim held to be preempted in *Chen v. Mayflower Transit*, Plaintiff's conversion claim arises out of the loss of her goods, not out of a separate personal harm. *See Chen*, 2002 WL 1632412, at *15. Accordingly, the Court grants Defendant National's motion to dismiss Count II as preempted by the Act.

### C. Counts III and IV — Emotional Distress

If the harm alleged arises solely out of Defendants' handling of Plaintiff's goods and Plaintiff's claim, the Carmack Amendment preempts Plaintiff's claims for intentional and

9

negligent infliction of emotional distress. *See Gordon*, 130 F.3d at 284. Defendant asserts that the Act preempts the claims because the emotional distress would not have occurred absent a contractual relationship between National and the Plaintiff. *Id.* at 6. Plaintiff argues, however, that the harm resulted not from Defendant's treatment of her goods, but from Defendant's treatment of *her*. (R. 18-1, Pl.'s Resp. in Opp'n to Def.'s Mot. to Dismiss at 6.) Plaintiff's amended complaint highlights acts relating to National's handling of her goods and National's treatment of her personally. (R. 3-1, Pl.'s First Am. Compl. ¶¶ 110-128.) She requests relief for "emotional distress caused by National and its agents" (Count III) and for "emotional distress caused by National" (Count IV). (*Id.* at pages 21-22.)

Plaintiff compares this case to *Gordon*, in which the Seventh Circuit held that the Carmack Amendment did not preempt a plaintiff's claim for intentional infliction of emotional distress. *Gordon*, 130 F.3d at 289. In that case, a moving company permanently lost part of an elderly woman's shipment and repeatedly assured her that the goods were safe even though it had lost control of the shipment. *Id.* at 284-85.

In an earlier case, the Seventh Circuit held that the Act preempted a plaintiff's claim for negligent infliction of emotional distress. *Hughes*, 829 F.2d at 1415. *Hughes* stands for the proposition that "the remedy provision of the Carmack Amendment preempts all state and common law remedies inconsistent with the Interstate Commerce Act." *Id.* at 1415. The court did not individually analyze the negligent infliction of emotional distress claim. In light of the court's later decision in *Gordon*, *Hughes* does not preclude a finding that negligent infliction of emotional distress could, in some circumstances, constitute a remedy consistent with the Act.

Defendant compares this case to *Glass v. Crimmins Transfer Co.*, in which the District Court for the Central District of Illinois held that the Carmack Amendment did preempt a

10

plaintiff's claim for emotional distress. *Glass*, 299 F. Supp. 2d 878, 887 (C.D. Ill. 2004). In that case, a moving company allowed a family's furniture to become moldy while in storage, and allegedly attempted to conceal the damage. *Id.* at 883, 887. The family suffered health problems as a result of the damage. *Id.* at 883. The court held that the Act preempted the family's emotional distress claims because the distress "arose directly from the carrier's mishandling of the property and the subsequent claims." *Id.* at 887. It distinguished the defendants' actions from the "blatant and multiple misrepresentations made to the plaintiff about the shipment of her property" in *Gordon*. *Id.*

Based on the facts as alleged, this case more closely resembles *Gordon*. Though Plaintiff Schwarz's emotional distress allegedly arose from a combination of the Defendant's mishandling of her goods and of Defendant's misleading reassurances, the facts more closely mirror the repeated misrepresentations present in *Gordon*. Accordingly, the Court denies Defendant National's motion to dismiss Counts III and IV, and grants Plaintiff leave to amend her complaint to remove allegations linking her distress to National's handling of her goods.

### D. Count V - Breach of the Implied Covenant of Good Faith and Fair Dealing

Neither the Seventh Circuit nor this Court has considered whether the Carmack Amendment preempts claims for breach of implied covenant of good faith and fair dealing. The Second Circuit addressed the issue of whether a plaintiff shipper could assert a request for punitive damages for breach of implied covenant of good faith and fair dealing. *Cleveland v. Beltman N. Am. Co.*, 30 F.3d 373, 377 (2$^d$ Cir. 1994). Reasoning that allowing such a claim would be contrary to the purposes of the Act, it held "that a claim for breach of the implied covenant of good faith and fair dealing cannot exist alongside the Carmack Amendment." *Id.* at 379.

"[U]nder Illinois law, the covenant of good faith and fair dealing has never been an independent source of duties for the parties to a contract. A lack of good faith does not by itself create a cause of action...." *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443 (7th Cir. 1992). Rather than being a cause of action in and of itself, the covenant of good faith and fair dealing "guides the construction" of an explicit contract. *Id.* In other words, the covenant depends on the existence of an underlying contract and constitutes a state law claim based upon the contract of carriage. Under *Gordon*, the Act preempts such claims. Accordingly, the Court grants Defendant National's motion to dismiss Count V.

### E. Count VI – Constructive Fraud

Neither the Seventh Circuit nor this Court has considered whether the Carmack Amendment preempts claims for constructive fraud. The Seventh Circuit has, however, considered common law fraud and actions under the Illinois Consumer Fraud and Deceptive Business Practices Act, and held that the Act preempts both. *Gordon*, 130 F.3d at 289. The Seventh Circuit reasoned that the Carmack Amendment preempted the claims because the plaintiff's allegations of fraud in the inducement and fraud in the claims process were "so closely related to the performance of the contract, and the measure of damages for such claims so likely to be the loss or damage to the goods." *Id.* It further reasoned that the claims process is inextricably tied to the loss or damage of goods because "people would not be involved in the process unless either loss or damage had occurred." *Id.* at 290. Because the Act directly regulates the claims process, it controls these claims. *Id.*

Plaintiff Schwarz's amended complaint relies on allegations that Defendant National breached its fiduciary duties owed to Plaintiff by deceiving Plaintiff about the safe and timely delivery of her goods, and by failing to diligently search for Plaintiff's lost goods. (R. 3-1, Pl.'s

12

First Am. Compl. ¶ 138.) Like the fraud examined by the Seventh Circuit in *Gordon*, the fraud alleged here is closely tied to Defendant's handling of Plaintiff's goods. Plaintiff cites no authority suggesting that different reasoning should apply to constructive fraud. Therefore, the constructive fraud in the claims process is tied to the loss or damage of shipped goods just as closely as common law or Illinois state law fraud, and the Act preempts the claim. Accordingly, the Court grants Defendant National's motion to dismiss Count VI.

## II. RICO Allegations – Counts VII and VIII

In Counts VII and VII, Plaintiff alleges Section 1962(c) RICO violation against Defendants Schiesser and Apex. Plaintiff does not allege that National was directly involved in the enterprises or the predicate acts, but instead seeks to hold National vicariously liable for the conduct of its agents, Schiesser and Apex.

National first argues that Plaintiff has failed to state a Section 1962(c) claim for which it can be vicariously liable because she has failed to allege that National engaged or participated in two predicate acts. The Court agrees. "[A] pattern of racketeering activity consists, at a minimum, of two predicate acts of racketeering (committed within a ten-year time period)." *Slaney v. The Intern. Amateur Athletic Federation*, 244 F.3d 580, 598-99 (7th Cir. 2001) (citations and quotations omitted). *See* 18 U.S.C. § 1962(c). Accordingly, Counts VII and VIII are dismissed without prejudice. The Court need not address Plaintiff's remaining arguments at this time.

## CONCLUSION

For the foregoing reasons, the Court grants in part Defendant National's motion to dismiss. The Court grants the motion to dismiss Counts II, V, and VI, and denies the motion with respect to Counts I, III, and IV. Plaintiff's request for punitive damages under Count I is dismissed. Plaintiff's motion is granted with respect to Counts VII and VIII without prejudice. Plaintiff's motions to strike with regard to Counts I and IV are denied as moot. Plaintiff has until June 4, 2004 to file an amended complaint.

Dated: May 20, 2004                    ENTERED

_____
AMY J. ST. EVE
United States District Court Judge