**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SOFIA SCHWARZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03 C 7096 |
| | ) | |
| NATIONAL VAN LINES, INC., | ) | |
| DWAYNE SCHIESSER, and | ) | |
| APEX RELOCATION SPECIALISTS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

Plaintiff Sofia Schwarz ("Schwarz") sued Defendant National Van Lines, Inc. ("National"), under a number of theories. The Court has dismissed all of Schwarz's claims except her federal claim for breach of contract under 49 U.S.C. § 14706 (the "Carmack Amendment"), and her state law claims of intentional and negligent infliction of emotional distress. *See Schwarz v. National Van Lines*, No. 03 C 7096, 2004 WL 1166632, *1 (N.D. Ill. May 21, 2004); *Schwarz v. National Van Lines*, No. 03 C 7096, 2004 WL 1497804, *1 (N.D. Ill. July 2, 2004). National now moves for summary judgment, contending that the Carmack Amendment preempts Schwarz's two remaining state law claims, and, alternatively, that Schwarz cannot establish the underlying essential elements of those claims. For the reasons discussed below, the Court denies National's motion.

# BACKGROUND

## I.    The Parties

Schwarz is a resident and citizen of Oregon.  (R. 92-1; Pl.'s Resp. to Def.'s Stmt. Mat. Facts ("Def.'s SMF"), Ex. 1 at 4.).  National, an Illinois corporation, is an authorized motor carrier engaged in the business of transporting household goods.  (R. 80-1; Def.'s SMF at ¶ 1.) Defendant Dwayne Schiesser ("Schiesser") is a resident and citizen of Texas.  (R. 3-1; First Am. Compl. ¶ 3.)  Defendant Apex Relocation Specialists, Inc. ("Apex") is a defunct Texas corporation that provided interstate shipping of household goods as an agent of National and on its own behalf.  (*Id.* at ¶¶ 4, 48.)  Neither Apex nor Schiesser has answered the Complaint, and the Court entered default judgment against both parties.  (R. 33-1; Ord. Granting Default J.)

## II.    Schwarz's Move from Scottsdale, Arizona to Salem, Oregon

In December 2000, Schwarz, a widow and 65 years old at the time, hired National to transport her personal household belongings from Scottsdale, Arizona to Salem, Oregon; Schwarz tendered her belongings under a Uniform Household Goods Bill of Lading & Freight Bill (the "Bill of Lading").  (R. 80-1; Def.'s SMF at ¶¶ 7, 8; R. 92-1; Pl.'s Stmt. Additional Mat. Facts ("Pl.'s SAMF") at ¶ 1.)  Two years prior, Schwarz had moved from her home in the Pacific Northwest to Scottsdale to attend the Scottsdale Culinary Institute.  (R. 92-1; Pl.'s SAMF at ¶ 1.) After completing school and obtaining experience in a professional kitchen at the Four Seasons hotel in Scottsdale, Schwarz planned to move to Salem to open her own business, a café and pastry shop.  (*Id.*)  National did not transport Schwarz's shipment itself, but rather consigned the Bill of Lading to Apex.  (*Id.* at ¶ 2.)

In performing its transportation services, National typically operates through a network

of agents and drivers. (*Id.* at ¶ 3.) When, as in Schwarz's case, National has sold a move, but does not have an agent available to transport it, National will use what it refers to as an "interline carrier," such as Apex, rather than one of its own agents. (*Id.* at ¶¶ 4, 7.) To become an "interline carrier" for National, a company contacts National and requests to haul shipments for them. (*Id.* at ¶ 6.) The carrier then enters into an "interline agreement" with National – a document that primarily sets forth the terms of compensation between National and the carrier, rather than the carrier's obligations toward National's customers. (*Id.*) When the interline agreement is executed, National, as a matter of policy, is supposed to verify that the carrier has both appropriate insurance and the requisite authority to operate as an interstate carrier. (*Id.*) After execution, National does not periodically reassess whether that interline carrier's authority and insurance remain in good standing. (*Id.*) As to Apex specifically, National did not verify that Apex had appropriate authority or insurance, other than when Apex executed its interline agreement in December 1999. (*Id.* at ¶¶ 9, 10.) In addition, National did not check to see if anyone had filed a complaint against Apex with the Department of Transportation or the Better Business Bureau before entering into an interline agreement with Apex and giving it possession of Schwarz's belongings. (*Id.* at ¶ 9.) At the time of Schwarz's shipment, Apex's insurance had been cancelled and the United States Department of Transportation had revoked Apex's interstate operating authority.[1] (*Id.* at ¶ 11.)

Although National claims it expects the same level of customer service from an "interline carrier" that it would from its own agents, it does not communicate any rules, requirements, or

---

[1]     Plaintiff's SAMF incorrectly states that National's insurance and authority had been cancelled. The supporting citation makes clear, however, that this statement of fact should have referred to Apex.

3

standards of service to such carriers beyond what is contained in the interline agreement. (*Id.* at ¶ 8; *id.,* Ex. 5 at 2 (a sample interline agreement stating only that the interline carrier "shall promptly, safely and expeditiously perform the [transportation] service . . .").) Further, while National's drivers and agents undergo criminal and employment background checks, (*id.* at ¶ 3), National does not conduct a similar review of interline carrier agents and drivers. (*Id.* at ¶ 5) National also does not verify that drivers for an interline carrier meet the "stringent" requirement imposed by federal regulations for background checks and other screening. (*Id.*) Even so, National remains responsible for all shipments that it assigns to an "interline carrier." (*Id.* at ¶ 4.)

For her move from Arizona to Oregon, Schwarz contacted National's local agent, Carl Carter of Central Moving and Storage ("Central"). (*Id.* at ¶ 12.) Although National agreed to pick up Schwarz's belongings between December 26 and December 30, 2000, no one arrived during that five-day period to pick them up. (*Id.*) On December 31, 2000, Schwarz called Carter several times to inquire when the driver would arrive to pick up her belongings. (*Id.* at ¶ 13.) After representing to Schwarz that he had spoken with National's headquarters, Carter informed her that the driver would arrive momentarily. (*Id.*) Several hours later, the driver still had not arrived. (*Id.* at ¶ 14.) Schwarz called Carter again to inform him that she had slept in her clothes the night before (having expected National to have already picked up her belongings), that she had no food, and that she had to vacate her residence by the end of the day. (*Id.*) Carter reassured Schwarz that the driver, Schiesser, had worked for National for nine years and during that time National had "never" had a problem with him. (*Id.*) Several hours later, Schwarz spoke with Carter again to request that he put her belongings into storage until National could

find a more reliable driver. (*Id.* at ¶ 15.) Carter again assured Schwarz that Schiesser was "reliable," and, although Central was prepared to store Schwarz's belongings, Carter continued to reassure Schwarz that Schiesser would arrive. (*Id.*) At some point thereafter, Schiesser arrived in a Ryder rental truck. (*Id.* at ¶ 16.) Central's employees helped Schiesser load Schwarz's belongings, even though, as Carter testified, the use of a rental truck was not normal procedure. (*Id.)* After Central and Schiesser loaded Schwarz's belongings on the truck, Schiesser asked Schwarz for $400 cash, a proposition that National admits is improper. (*Id.* at ¶ 17.) Moreover, Schiesser did not deliver Schwarz's goods as scheduled. (*Id.* at ¶ 36.)

### III. Schwarz's Attempt to Retrieve Her Goods

After Schiesser failed to deliver the shipment, Schwarz spoke with Bob Donnelly, National's Manager of Operations, who was unwilling to provide Schwarz with information regarding National's investigation into the whereabouts of Schiesser or Schwarz's property. (*Id.* at ¶ 19.) In addition, National's Safety Director, Rand Walker, who was "primarily responsible" for locating Schwarz's shipment, did not review National's files for information about Apex until Schwarz's shipment had been missing for several weeks. (*Id.* at ¶¶ 20, 23, Ex. 3 at 22.) Those files, in fact, contained contact information for Apex and Schiesser, including the location where Schwarz's belongings were ultimately located four months later. (*Id.* at ¶ 20.) After reviewing these files, National thus had reason to believe that Schiesser had taken Schwarz's belongings to his residence in Weatherford, Texas. (*Id.* at ¶ 22.) Walker, however, could not recall whether he had relayed this information to the police, Schwarz, or her attorneys. (*Id.*) Ten days after Schiesser picked up the shipment, Schwarz's son, Peter Frease, contacted Walker to determine what actions National was taking to locate the shipment. (*Id.* at ¶ 23.)

Walker assured Frease that National was doing "everything in its power to locate and effect delivery of the shipment." (*Id.*, Ex. 3 at 125.) National, however, had not yet called the police to report the shipment as missing. (*Id.* at ¶ 23.) National finally called the police on January 22, 2001. (*Id.* at ¶ 24.) Because Schwarz's shipment traveled interstate, National could have contacted the FBI, but did not, even though National told Schwarz that it had done so. (*Id.* at ¶ 26.)

National's Vice President of Operations testified that "standard procedure" when it could not locate a truck included sending out a bulletin to all members of the American Moving & Storage Association to remain on the look-out for the missing truck. (*Id.* at ¶ 27.) National, however, did not issue such a bulletin regarding Schwarz's missing shipment. (*Id.*)

Although National had never had a driver disappear with one of its shipments before, neither Walker nor National's corporate designee could recall meeting with their supervisees to determine what could be done to recover Schwarz's shipment. (*Id.* at ¶ 30.) By January 24, 2001, Walker recommended to National that it make a more coordinated effort to try and locate Schwarz's goods. (*Id.* at ¶ 31.) He testified, however, that National did not follow his recommendation. (*Id.*) Since at least February 8, 2001, National had identified a Weatherford, Texas address (where Schwarz's belongings ultimately were found) as one of Apex's business addresses. (*Id.* at ¶ 32.) National, however, did not report this address to police, did not try to contact anyone at that address, and did not ask its agents in Texas to inspect that location. (*Id.* at ¶¶ 27, 32.)

Amid these events, National stopped payment on a check to Apex for moving services it had performed prior to Schwarz's move and for which Apex properly was entitled to payment.

(*Id.* at ¶ 33.)  After stopping payment, National received a phone call from Bret West, an associate of Apex, who said he knew the location of Schwarz's property, and offered to deliver it if National would reverse the stop-payment order.  (*Id.*)  National failed to inform Schwarz about Apex's offer.  (*Id.*)

On March 12, 2001, Schwarz called National requesting information and assistance regarding her lost shipment.  (*Id.* at ¶ 35.)  She told National in a voicemail message that she was "on the brink of a nervous breakdown," and that she felt she was "being tortured by National Van Lines for the third time."  (*Id.*)  Schwarz further described feeling that National was treating her as a "non-entity," and told National, "I can't take it anymore."  (*Id.*)  Schwarz specifically requested to speak with Walker about what National was doing to locate her belongings.  (*Id.*)  Walker did not return the call.  (*Id.*)  Providing an apt backdrop for this message, Daniel Johnson, Director of National's Claims Department, testified that, based on his work with three carriers for over 25 years, "[t]he fact that [a shipment] was delivered . . . four months late I know instinctively would be very upsetting to Ms. Schwarz.  Moves are probably one of the most stressful things that happen in our lifetime.  So, yes, I would instinctively know that she would be upset and be very upset because of that."  (*Id.*, Ex. 17 at 148-50.)  For his part, National's corporate designee testified that because Schwarz's "household goods were missing, I'm sure she was upset.  I would be, too."  (*Id.*, Ex. 2 at 98.)

Schwarz's belongings ultimately turned up in Weatherford, Texas.  (*Id.* at ¶ 36.)  At first, National promised to pay for the cost of Schwarz's round-trip airfare to travel to identify and inspect her belongings, but after six months of delay, National offered to pay only 50% of her ticket.  (*Id.* at ¶ 37.)  Schwarz rejected the scaled-back offer. (R. 98-1; Def.'s Resp. to Pl.'s

SAMF at ¶ 37.)  In any event, Schwarz's shipment arrived in Salem, Oregon on April, 22, 2001 – approximately four months after it was originally scheduled to arrive.  (R. 92-1; Pl.'s SAMF at ¶ 38.)

## IV.  Schwarz's Emotional Reaction to National's Conduct

Before receiving her goods, Schwarz was "despondent" and "depressed" and "lacked energy [or] interest in anything."  (*Id.* at ¶ 45.)  On April 22, 2001, when the shipment arrived, Schwarz was hysterical, and immediately began hyperventilating, shaking, and crying.  (*Id.* at ¶ 46.)  In response to this reaction, Schwarz sought medical treatment.  (*Id.*)  Even so, Schwarz's depression continued after her belongings arrived.  (*Id.* at ¶ 45.)  Indeed, in the months after her property was discovered, Schwarz's sister observed that she became still more distant and disconnected.  (*Id.*)

Dr. Robert Davies, Schwarz's personal physician, is a licensed physician and board certified in internal medicine who has been trained to treat acute psychotic problems and has treated patients for psychiatric and psychological conditions such as depression and acute anxiety reaction.  (*Id.* at ¶ 47.)  On April 24, 2001, Dr. Davies conducted a mental examination of Schwarz and concluded that Schwarz's anxiety reaction might be a precursor to post-traumatic stress syndrome.  (*Id.*)  Dr. Davies believes that Schwarz suffered the acute anxiety reaction as a result of the events related to her move by National.  (*Id.*)  The parties' experts agree that Schwarz continues to suffer from an "adjustment disorder," although disagreeing, not surprisingly, as to the severity of that disorder.  (*Id.*, Ex. 10 at 65-67, Ex. 26 at 166-67, Ex. 27 at 50-52.)

## V.  Schwarz's Claim with National

On May 16, 2001, Schwarz filed a formal claim with National.  (*Id.* at ¶ 40.)  On May 21, National sent the claim to its insurance carrier, Vanliner, Inc. ("Vanliner"), but did not follow up with Vanliner regarding Schwarz's claim.  (*Id.*)  Over three months later, on August 23, 2001, Vanliner responded to Schwarz's claim, offering $738.34 to compensate Schwarz for the loss and damage to her property.  (*Id.* at ¶ 41.)  This offer did not include Schwarz's claims for delay or other damages.  (*Id.*)  National did not review these lingering claims until October 2001.  (*Id.* at ¶ 42.)  Thereafter, National offered to settle these claims, deducting freight charges from the amount of reimbursement to which Schwarz otherwise would have been entitled.  (*Id.* at ¶ 43.)  Schwarz declined the offer.  (*Id.*)  In response, National sued Schwarz in Arizona seeking a declaratory judgment that any claims for damages against National were time-barred.  (*Id.* at ¶ 44.)  National further sought an award of attorneys' fees and costs.  (*Id.*)  After learning that National had sued her, Schwarz reacted with hysteria, crying, and shaking, and she almost fainted.  (*Id.* at ¶ 48.)  Schwarz's hysterical episodes continue to the present.  (*Id.*)  Schwarz also suffers from recurring nightmares, twitching in a limb, and eczema, none of which was present prior to her move.  (*Id.*)

## ANALYSIS

### I.   Legal Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202

(1986).  In determining whether a genuine issue of material fact exists, the Court must construe

all facts in a light most favorable to the non-moving party and draw all reasonable and justifiable

inferences in favor of that party.  *Id.* at 255.  The party seeking summary judgment has the

burden of establishing the lack of any genuine issue of material fact.  *Celotex Corp. v. Catrett*,

477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed.2d 265 (1986).  The existence of a factual

dispute is not sufficient to defeat a summary judgment motion, instead the non-moving party

must present definite, competent evidence to rebut the summary judgment motion.  *Butts v.*

*Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004).[2]  With these standards in mind, the

Court turns to the merits of National's motion.

II.     **As the Court Ruled Previously, the Carmack Agreement Preempts Schwarz's**
        **Claims Only to the Extent Her Emotional Distress Damages Relate Specifically to**
        **the Loss of Her Goods**

        In its motion for summary judgment, National reasserts an argument it raised in its

motion to dismiss – that the Carmack Amendment preempts Schwarz's state law claims for

emotional distress.[3]  As the Court previously stated, the Carmack Amendment preempts only

those damages resulting from certain carrier conduct:

------

[2]     National also moves for judgment on the pleadings under Federal Rule of Civil
Procedure 12(c).  Because the Court must look beyond the pleadings in weighing the issues
raised in National's motion, Federal Rule of Civil Procedure 56 governs the Court's analysis.
*See* Fed. R. Civ. P. 12(c); *Dempsey v. Atchison, Topeka, and Santa Fe Ry.*, 16 F.3d 832, 835-36
(7th Cir. 1994).

[3]     In response to National's preemption argument, Schwarz asserts that she is
entitled to recover emotional distress damages under 49 U.S.C. § 14704(a)(2).  Whether such a
recovery is possible is not an issue before the Court because National did not move for summary
judgment as to damages generally, or as to Schwarz's federal breach of contract claim.

> [T]he Carmack Amendment's preemptive scope is broad, [but] not all-inclusive. The Carmack Amendment preempts all "state and common law remedies inconsistent with the federal Act." While the Act does preempt "all state law claims based upon the contract of carriage, in which the harm arises out of the loss of or damage to goods," it does not preempt "claims involving a separate and independently actionable harm to the shipper distinct from such damage."

*Schwarz*, 2004 WL 1166632 at *4 (quoting *Hughes v. United Van Lines, Inc.*, 829 F2d 1407, 1414 (7th Cir. 1987) and *Gordon v. United Van Lines, Inc.*, 130 F.3d 282, 284 (7th Cir. 1997)).

On the present record, a factual issue remains as to whether Schwarz's state law emotional distress claims stem from the "loss of, or damage to, the shipped household goods" itself, or from grounds separate and "distinct from" from that loss or damage. Contrary to National's conclusory assertion that "everything alleged by [Schwarz] falls squarely within the ambit of the interstate transportation of goods . . . the temporary loss of [Schwarz's] property, the recovery of her property, and the claims process," a reasonable jury could find that Schwarz's damages stem from other sources, namely the way in which National treated her while her shipment was missing. (*See, e.g.,* R. 92-1; Pl.'s SAMF at ¶ 19 (National refusing to provide Schwarz with information regarding its investigation), ¶ 37 (National promising to pay the cost of Schwarz's round-trip airfare Texas to inspect her belongings, but after six months of delay, ultimately offering to pay only 50% of her ticket), ¶ 47 (Schwarz's treating physician opining that Schwarz's emotional reaction stems from the result of the events related to her move with National), ¶ 48 (describing Schwarz's emotional reaction to National's declaratory judgment suit against her).) National's preemption theory does not warrant summary judgment on Schwarz's state law claims for emotional distress.

## III.     Negligent Infliction of Emotional Distress

As an initial matter, Schwarz takes issue with National's assumption that Illinois law

governs all substantive issues of this count. Specifically, Schwarz argues that Oregon law should apply because there is a conflict between that state's law and Illinois' regarding the breadth or applicability of the so-called "impact rule" – the requirement that a direct victim of tortious conduct prove a contemporaneous physical impact as a prerequisite to recovering emotional distress damages. At one point, Plaintiff argues that Oregon law should apply because it acknowledges an exception to the impact rule, whereas Illinois does not. (R. 94-1; Pl.'s Resp. to Def.'s Mot. for Summ. J. at 10.) Elsewhere in her brief, however, Schwarz argues that Illinois does not recognize the "impact rule" at all. (*Id.* at 18-20.) Plaintiff's equivocation is understandable. The state of the impact rule in Illinois is less than clear, to say the least. In any event, before addressing the merits of National's summary judgment motion, the Court must determine which state's law in fact governs. *Miller v. General Motors Corp.*, Nos. 98 C 7386, 98 C 2851, 2003 WL 168626, *3 (N.D. Ill. Jan. 26, 2003) ("a federal court faced with uncertain or undeveloped state substantive law may not throw up its hands and simply apply the forum's substantive law with the hope that the two would not conflict"); *see also Turner v. Sheriff of Marion County*, 94 F. Supp. 2d 966, 988 (S.D. Ind. 2000) ("When a federal district court sits in diversity, it should decide questions of state law . . . even when those questions are difficult, uncertain, or of first impression.").

### A.    The Governing Choice of Law Principles

When federal jurisdiction is based upon diversity of citizenship, a district court must look to the law of the forum in which it sits for substantive law, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817, 822, 82 L. Ed. 1188 (1938)*,* including the forum state's rules governing choice of law. *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S. Ct. 1020,

1021, 85 L. Ed. 1477 (1941).[4]  For actions sounding in tort, Illinois applies the "most significant contacts" approach.  *See Ingersoll v. Klein*, 46 Ill. 2d 42, 45, 262 N.E.2d 593, 595 (1970).  This approach presumes that the local law of the state in which the injury occurred applies unless another state has a "more significant relationship" with the occurrence and with the parties, in which case that state's substantive law would control.  *See id.*

"Rather than simply counting each state's contacts with the parties and the event involved and then selecting the law of the state with the highest tally, [courts must evaluate] each state's contacts in light of that state's interest in having its law applied to the occurrence." *Vantassell-Matin v. Nelson*, 741 F. Supp. 698, 703 (N.D. Ill. 1990) (citing *Mitchell v. United Asbestos Corp.*, 100 Ill. App. 3d 485, 492-93, 55 Ill. Dec. 375, 380, 426 N.E.2d 350, 255 (5th Dist. 1981)).  What results is a three-step conflicts-of-laws analysis:  "(1) isolate the issue and define the conflict, (2) identify the policies embraced in the conflicting laws, and (3) examine the contacts of the respective jurisdictions in order to determine which has a superior connection with the occurrence and thus would have a superior interest in having its policy or law applied." *Morris B. Chapman and Assocs. Ltd. v. Kitzman*, 307 Ill. App. 3d 92, 100-01, 240 Ill. Dec. 235, 244, 716 N.E.2d 829, 838 (5th Dist. 1999); *see also International Adm'rs, Inc. v. Life Ins. Co. of No. Am.*, 753 F.2d 1373, 1376 (7th Cir. 1985) ("The choice of law is not made once for all issues; the trend is to decide the applicable law for each issue separately.  Hence on issues about which there is no disagreement among the contact states, we would apply the law of Illinois, the forum

---

[4]     The state law claims at issue here also may fall within the Court's supplemental jurisdiction.  Either way, Illinois's choice of law rules would still govern.  *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 20 F.3d 713, 719 (7th Cir. 1994) (citation omitted), *rev'd on other grounds*, 514 U.S. 52, 115 S. Ct. 1212, 131 L. Ed. 2d 76 (1995) (like the choice-of-law rule for diversity claims, "the choice-of-law rule for pendent state claims should be that of the forum").

state."); Restatement (Second) Conflicts § 145, comment d ("[e]ach issue is to receive separate consideration if it is one which would be resolved differently under the local law rule of two or more of the potentially interested states"); *see generally In re Air Crash Disaster Near Chicago, Illinois on May 25, 1979*, 644 F.2d 594, 611 & n.13 (7th Cir. 1981) (recognizing that Illinois choice of law rules employ the issue-by-issue examination of conflicts of law called "depecage"); Am. Law of Prods. Liab. 3d § 46:5 (2004) (describing depecage thus: "Rather than applying the law of one state to all issues, the court must determine the jurisdiction whose law can most appropriately be applied to each issue on the basis of the relation of the pertinent policies of a particular substantive rule to the occurrence and the parties.").

"Because a conflicts analysis is only required when a difference in law will make a difference in outcome, [courts] initially must detect a conflict and then define it." *Morris B. Chapman and Assocs. Ltd.*, 307 Ill. App. 3d at 101, 240 Ill. Dec. at 244, 716 N.E.2d at 838. But if the parties do not present a conflict of law issue, a court need not look for one. *Wood v. Mid-Valley Inc.*, 942 F.2d 425, 427 (7th Cir. 1991) ("Courts do not worry about conflict of laws unless the parties disagree on which state's law applies."). In addition, "[i]f all interested jurisdictions (including the forum state) apply the same legal rule to any issue, the court should apply to that issue the law with which it is most familiar – that of the forum." *Vantassell-Matin*, 741 F. Supp. at 703 (citing *International Adm'rs*, 753 F.2d at 1376 n.4). Accordingly, the Court will limit its conflicts of law analysis to whether a conflict exists between Illinois and Oregon (the states whose law the parties propose to apply here) regarding the scope of the impact rule.

### B. Determining the Content of State Law

When a federal court exercises diversity jurisdiction, it must apply state substantive law

as interpreted by the highest court of the forum state.  *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 636-37 (7th Cir. 2002); *Erie*, 304 U.S. at 78, 58 S. Ct. at 822, 82 L. Ed. 1188 ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state . . . [a]nd whether the law of the state shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern."). "Considered *dicta* of a state supreme court must be given weight by a federal court in ascertaining state law, but casual *dicta* are not entitled to the same degree of deference."  *In re Air Crash Disaster*, 701 F.2d at 1196.  Absent definitive authority from the state supreme court, federal courts must give "great weight" to the state's intermediate appellate court holdings. *Allstate*, 285 F.3d at 637.  If neither the Illinois Supreme Court nor the Illinois Appellate Courts have squarely addressed an issue, the Court "must make a predictive judgment as to how the supreme court of the state would decide the matter if it were presented presently to that tribunal." *Id.* at 635; *see also Birchler v. Gehl Co.*, 88 F.3d 518, 521 (7th Cir. 1996) ("When . . . faced with opposing plausible interpretations of state law, [the Seventh Circuit] generally choose[s] the narrower interpretation which restricts liability, rather than the more expansive interpretation which creates substantially more liability.").  On this score, the Court is bound by the Seventh Circuit's interpretation of the content of unsettled state law.  *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004).  But "[a] decision by a state's supreme court terminates the authoritative force of [Seventh Circuit] decisions interpreting state law, for under *Erie* [the Seventh Circuit's] task in diversity jurisdiction is to predict what the state's highest court will do.  Once the state's highest court acts, the need for prediction is past."  *Id.*

### C. Isolating the Issue and Determining Whether a Conflict Exists

#### 1. Seventh Circuit Has Concluded that Illinois Still Follows the "Impact Rule"

To sustain a claim for negligent infliction of emotional distress, Illinois courts had traditionally required both direct tort victims and bystanders to satisfy the impact rule by presenting proof that they suffered some sort of contemporaneous physical impact with the event causing emotional distress. In recent years, the exact breadth, or even existence, of the impact rule has become unsettled. First, as to bystander cases, the Illinois Supreme Court eliminated the impact rule, replacing it with the "zone of danger" rule. *See Rickey v. Chicago Transit Auth.*, 98 Ill. 2d 546, 553-54, 75 Ill. Dec. 211, 214-15, 457 N.E.2d 1, 4-5 (1983) (discussing the "impact rule" but replacing that requirement in bystander cases with the "zone of physical danger rule"). Then, in *Corgan v. Muehling*, the Illinois Supreme Court made clear that, notwithstanding *Rickey*, the impact rule still applied to direct victims.[5]  143 Ill. 2d 296, 304-12, 158 Ill. Dec. 489, 492-96, 574 N.E.2d 602, 605-09 (1991) (further holding that emotional distress claims no longer required physical manifestations of emotional injury – an issue separate from the impact rule); *see also Kapoulas*, 11 F.3d 1380, 1382 (7th Cir. 1993) (interpreting *Corgan*); *Fenner v. Favorite Brands Int'l, Inc.*, No. 97 C 5906, 1998 WL 249232, *7-8 (N.D. Ill. May 12, 1998) (discussing at length *Corgan* and its two holdings).  In *Pasquale v. Speed Prod. Eng'g*, however, the Illinois Supreme Court, in *dicta*, seemingly expanded *Corgan*'s holding:  "[the court has] eliminated the contemporaneous injury or impact requirement for a direct victim's recovery for emotional

---

[5]     Under Illinois law, a claim from negligent infliction of emotional distress also requires direct victims to prove the traditional essential elements of negligence:  duty, breach, causation, and damages.  *See Corgan*, 143 Ill. 2d at 306, 158 Ill. Dec. at 494, 574 N.E.2d at 606.

distress on a theory of negligence."  166 Ill. 2d 337, 346-47, 211 Ill. Dec. 314, 320-21, 654

N.E.2d 1365, 1371-72 (1995) (discussing *Corgan* while considering "whether the elimination of

the contemporaneous injury or impact requirement for bystander recovery for emotional distress

in the area of negligence meaningfully translate[d] into an elimination of the element of physical

harm for a bystander's recovery for emotional distress under strict liability theory").

Courts have given varying effect to *Pasquale*'s pronouncement that the impact rule no

longer applies to direct victims.  Some courts have concluded that the *Pasquale* inaccurately

stated the then-current state of the law and have declined to construe that statement as

authoritative for *Erie* purposes.  *See Fenner*, 1998 WL 249232, *7-8 ("When the *Corgan* court

decided that a plaintiff need not allege that she suffered a 'physical injury or illness as a result of

her emotional distress,' it was referring to the requirement that a plaintiff allege a 'physical

manifestation' of her emotional distress, not the requirement that she suffer a physical impact or

injury in the first place"); *Chen v. Mayflower Transit, Inc.*, No. 99 C 6261, 2002 WL 1632412,

*11 (N.D. Ill. Jul 22, 2002) (same); *see also Brogan*, 181 Ill. 2d 178, 185, 229 Ill. Dec. 503, 506,

692 N.E.2d 276, 278 (the "second issue in *Corgan* was whether a plaintiff must plead physical

manifestations of the emotional distress in order to state a claim for negligent infliction of

emotional distress").  Other courts, however, have reached the opposition conclusion.  *See Kur v.

Fox Valley Press*, No. 96 C 3695, 1997 WL 89140, *5 (N.D. Ill. Feb. 21, 1997) (citing *Pasquale*

for the proposition that Illinois no longer requires a direct victim to prove a contemporaneous

physical impact).  In addition, Illinois state appellate courts also come down on both sides of the

issue.  *See, e.g., Doe v. Noe No. 1*, 293 Ill. App. 3d 1099, 1109, 228 Ill. Dec. 937, 944, 690

N.E.2d 1012, 1019 (1ˢᵗ Dist. 1997) ("To state a cause of action for the negligent infliction of

emotional distress, a direct victim needs only allege the same elements as any other cause of action based on negligence."); *cf. Rekosh v. Parks*, 316 Ill. App. 3d 58, 63-64, 249 Ill. Dec. 161, 167, 735 N.E.2d 765, 772 (2d Dist. 2000) (dismissing claim for negligent infliction of emotional distress for lack of contemporaneous physical impact).

Even though the status of the impact rule in Illinois remains uncertain, the Court's resolution of this issue is clear. Since *Pasquale*, the Seventh Circuit has determined that Illinois still follows the "impact rule" for direct victims. *See Cleveland v. Rotman*, 297 F.3d 569, 574 (7th Cir. 2002) (citing *Pasquale* yet affirming the dismissal of plaintiff's claim of negligent infliction of emotional distress for failure to allege a "physical impact" because "Illinois follows the 'impact rule,' which allows a plaintiff to recover . . . only if the distress is directly and causally related to a physical injury"). Because the Seventh Circuit's pronouncement is essential to its holding, the Court is bound by that determination. *Reiser*, 380 F.3d at 1029. Thus, the impact rule exists in Illinois and operates, apparently, without exception in direct victim cases, such as here.

### 2. Oregon Law Employs the "Impact Rule," But Also Recognizes an Exception to That Rule

Like Illinois, Oregon generally requires a plaintiff to prove physical impact in order to recover under a theory of negligent infliction of emotional distress. *See Lockett v. Hill*, 182 Or. App. 377, 380, 51 P.3d 5, 6 (2002) ("Generally, a person cannot recover for negligent infliction of emotional distress if the person is not also physically injured, threatened with physical injury, or physically impacted by the tortious conduct") (citing *Hammond v. Central Lane Communications Ctr.*, 312 Or. 17, 22-25, 816 P.2d 593 (1991)). But, unlike Illinois, "Oregon allows recovery for emotional distress without accompanying physical injury under narrow

18

circumstances, including when a defendant's conduct infringes on a plaintiff's legally protected interest." *Rathgerber v. Hemenway, Inc.*, 335 Or. 404, 414, 69 P.3d 710, 716 (2003); *Shin v. Sunriver Preparatory School, Inc.*, 199 Or. App. 352, 365, 111 P.2d 762, 770 (2005). The "legally protected interest so identified must be 'of sufficient importance to warrant the award of damages for emotional distress.'" *Shin*, 199 Or. App. at 365, 111 P.2d at 770 (quoting *Curtis v. MRI Imaging Servs. II*, 148 Or. App. 607, 620, 941 P.2d 602, 610 (1997)). Put another way, certain types of "special relationships" in which one party owes the other a heightened duty of care, beyond the common-law duty to exercise reasonable care to prevent foreseeable harm, give rise to a legally protected interest sufficient to support the imposition of liability for purely emotional harm without proof of physical impact. *Id.*

Thus, the conflict is defined: Oregon law carves out an exception to the impact rule for negligent infliction of emotional distress, while Illinois does not.[6]

### D. Identifying the Policies Underlying the Conflicting Laws

Having found that an actual conflict of law exists, the Court next must identify the policies embraced in the law of each of the competing states. To this end, Illinois law turns to the Restatement of Conflicts for guidance. The Court must consider these factors:

(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.

---

[6] By offering no argument in her briefing, Schwarz appears to concede that she cannot demonstrate proof of a contemporaneous physical impact.

*Morris B. Chapman & Associates,* 307 Ill. App. 3d at 100, 240 Ill. Dec. at 243, 716 N.E.2d at 837 (5ᵗʰ Dist. 1999) (citing Restatement (Second) of Conflict of Laws § 6(2)); *Pittway Corp. v. Lockheed Aircraft Corp.*, 641 F.2d 524, 526-27 (7ᵗʰ Cir. 1981); *Vantassell-Matin*, 741 F. Supp. at 703.

Applying these principles here, Oregon law recognizes that certain relationships carry a special, heightened responsibility to avoid causing emotional distress – a responsibility that is of such importance as to give rise to a "legally protected interest." *See Shin*, 199 Or. App. at 365, 111 P.2d at 770*; see generally Curtis v. MRI Imaging Services II*, 148 Or. App. 607, 619-21, 941 P.2d 602, 609-10 (1997). Oregon's exception to the impact rule thus strives to preserve this legally protected interest by allowing plaintiffs to recover for emotional distress even in the absence of physical injury or impact. *See Shin*, 199 Or. App. at 365-72, 111 P.2d at 770-74; *see also Conway v. Pacific Univ.*, 324 Or. 231, 239, 924 P.2d 818, 824 (1996). On the other side of the equation, Illinois's across-the-board application of the impact rule likely is intended to provide a finite limit to a tortfeasor's liability for negligent conduct. *See Allen v. Otis Elevator Co.*, 206 Ill. App. 3d 173, 181-82, 150 Ill. Dec. 699, 705, 563 N.E.2d 826, 832 (1ˢᵗ Dist. 1990) (the impact rule "provide[s] a cut-off point for liability for physical injuries resulting from emotional distress inflicted by [a] defendant's negligence . . ."); *see also Rickey v. Chicago Transit Auth.*, 101 Ill. App. 3d 439, 442, 57 Ill. Dec. 46, 49, 428 N.E.2d 596, 599 (1ˢᵗ Dist. 1981) (tacitly acknowledging that the impact rule serves the purpose of limiting  potentially infinite liability of a defendant for the consequences of his negligent acts).

### E.    Identifying Significant Contacts

Finally, the court must "examine the contacts of the respective jurisdictions to ascertain

which has a superior connection with the occurrence and thus would have a superior interest in having its policy or law applied." *Mitchell*, 100 Ill. App. 3d at 494, 55 Ill. Dec. at 382, 426 N.E.2d at 357 (quotation omitted). Illinois law recognizes the following as significant contacts:

(a) the place where the injury occurred,
(b) the place where the conduct causing the injury occurred,
(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
(d) the place where the relationship, if any, between the parties is centered.

*See Morris B. Chapman & Assocs., Ltd.,* 307 Ill. App. 3d at 100, 716 N.E.2d at 837, 240 Ill. Dec. at 243; *Pittway Corp. v. Lockheed Aircraft Corp.*, 641 F.2d at 526; *Vantassell-Matin*, 741 F. Supp. at 703 (noting that Illinois has adopted the significant contacts identified in the Restatement of Conflicts § 145). Although Illinois courts still give presumptive weight to the place of injury, a party may readily overcome that presumption if another state has a more significant interest in applying its law. *See Kaczmarek v. Allied Chemical Corp.*, 836 F.2d 1055, 1058 (7th Cir. 1987).

In this case, Oregon is the place where the injury occurred. Although the factual background indicates that Schwarz was stood up in Arizona and later had to retrieve her goods in Texas, Schwarz's injury did not manifest itself until she returned to Oregon. Similarly, the conduct causing the injury occurred, at least arguably, in Arizona and Texas, but the bulk of it took place in Illinois, where National is headquartered. Currently, Schwarz is domiciled in Oregon and the Defendant is incorporated in Illinois. There does not appear to be a discernible center to the parties' relationship, other than perhaps Arizona where they executed their agreement.

Despite having several candidates, the parties focus their conflicts of law dispute on

whether Illinois or Oregon law applies.  Either state would have a theoretical interest in applying its law.  But given the fact that National had an established relationship with Schwarz and purposefully communicated with her, there is no reason to apply Illinois' version of the impact rule.  Simply put, National does not face the risk of infinite potential liability to unforeseen parties.  The application of Oregon's law, on the other hand, would further its underlying policy – Schwarz could obtain redress for the abuse of a special relationship (the existence of which will be discussed below).

Accordingly, the Court will apply Oregon law (presumptively the law to be applied in any event) as it has the most significant interest in having its law apply to the impact rule issue. The Court nonetheless will apply Illinois law, the law with which the Court is most familiar, to all other substantive elements in this count.[7]  *Vantassell-Matin*, 741 F. Supp. at 703; *see also Wood v. Mid-Valley Inc.*, 942 F.2d at 427.

**F.    The Merits of National's Motion**

The Court now turns to the merits of National's motion for summary judgment as to Schwarz's claim of negligent infliction of emotional distress.  National asserts that the Court should grant summary judgment on this claim because Schwarz cannot establish certain essential elements of her claim, namely (1) duty, (2) causation, or (3) a contemporaneous physical impact. *See Corgan*, 574 N.E.2d at 606.  The Court will address each of National's arguments in turn.

---

[7]      It appears that, aside from the impact rule, Oregon law and Illinois law do not conflict as to the other essential elements of a claim for negligent infliction of emotional distress. *See Corgan*, 143 Ill. 2d at 306, 158 Ill. Dec. at 494, 574 N.E.2d at 606; *cf. Hammond*, 312 Or. at 22-25, 816 P.2d at 596-97; *Shin*, 199 Or. App. at 365, 111 P.3d at 770; *Delaney v. Clifton*, 180 Or. App. 119, 124, 41 P.3d 1099, 1103 (2002).
.

### 1.    National Owed a Duty of Care to Schwarz

"Duty is the legal obligation to conform one's behavior to a particular standard for the benefit or protection of another."  *Hendrix v. Stepanek*, 331 Ill. App. 3d 206, 217, 264 Ill. Dec. 855, 865, 771 N.E.2d 559, 569 (5th Dist. 2002); *Corgan*, 143 Ill. 2d at 306, 158 Ill. Dec. at 493, 574 N.E.2d at 606 (defining duty as whether the defendant and the plaintiff stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff).  The determination of whether a duty exists is an issue of law for the Court to determine.  *Corgan*, 143 Ill. 2d at 306, 158 Ill. Dec. at 493, 574 N.E.2d at 606 (citing *Kirk v. Michael Reese Hosp. & Med. Ctr.*, 117 Ill. 2d 507, 525, 111 Ill. Dec. 944, 513 N.E.2d 387 (1987); *Ferrell v. Esparza*, 332 Ill. App. 3d 518, 523, 265 Ill. Dec. 886, 890, 773 N.E.2d 650, 654 (5th Dist. 2001) ("The question of whether a duty exists and the scope or range of protection of such a duty are normally questions of law to be determined by the court on a case-by-case basis."); *see also Mieher v. Brown*, 54 Ill. 2d 539, 545, 301 N.E.2d 307, 310 (1973) ("It is apparent that the concept of duty in negligence cases is very involved, complex and indeed nebulous.").  "[A]bsent a showing from which the court can infer the existence of a duty, no recovery by plaintiff is possible as a matter of law and summary judgment in favor of the defendant is proper."  *Schoenbeck v. Du Page Water Comm'n*, 240 Ill. App. 3d 1045, 1048, 180 Ill. Dec. 624, 626, 607 N.E.2d 693, 695 (2[d] Dist. 1993).

"It is well settled that every person owes a duty of ordinary care to all others to guard against injuries which naturally flow as a reasonably probable and foreseeable consequence of an act . . ."  *Widlowski v. Durkee Foods, Div. of SCM Corp.*, 138 Ill. 2d 369, 373, 150 Ill. Dec. 164, 165, 562 N.E.2d 967, 968 (1990) (internal citation omitted); *see also Adams v. Northern Illinois*

*Gas Co.*, 211 Ill. 2d 32, 44, 809 N.E.2d 1248, 1257, 284 Ill. Dec. 302, 311 (2004); *Corgan*, 143 Ill. 2d at 306, 158 Ill. Dec. at 493, 574 N.E.2d at 606 ("In determining whether to impose a duty upon a defendant, a court will look at various policy considerations, such as the likelihood of harm, the gravity of the injury, the burden of guarding against the injury, and the relationship between the parties"). Therefore, in determining whether the defendant owed a duty to the plaintiff, a court must consider whether the risk of harm to the plaintiff was reasonably foreseeable. *Widlowski*, 138 Ill.2d at 373, 150 Ill. Dec. at 165, 562 N.E.2d at 968.

National owed Schwarz a duty of care. Schwarz correctly points out that National's argument to the contrary is too narrow. The question of duty does not hinge solely on whether National had a duty to solve the crime or retrieve Schwarz's goods, as National contends. (*See, e.g.*, R. 79-1; Def.'s Mem. in Support of Def.'s Mot. for Summ. J. at 6-7.) Rather, more generally, National had the duty to guard against Schwarz's injuries, to the extent they were a reasonably probable and foreseeable consequence of National's conduct.

Based on the specific facts of this case, it is reasonably probable and foreseeable that Schwarz could suffer an emotional injury in this context. In some sense, an emotional injury was foreseeable because, as National itself describes, "[m]oves are probably one of the most stressful things that happen in our lifetime" and losing a shipment of personal belongings is "very upsetting." (R. 92-1; Pl.'s SAMF, Ex. 17 at 148-150, Ex. 2 at 98.) On top of this inherent stress, several factors increased the foreseeability and probability of emotional harm. First, at the outset of their relationship, National missed the scheduled pick up time (a period spanning five days), and its agents had loaded Schwarz's possessions, not on a company or commercial truck, but on a Ryder rental truck. (*Id.* at ¶ 16.) Second, when viewed in a light most favorable

24

to Plaintiff, National was less than forthcoming and helpful to Schwarz during the search for her belongings. For example, National initially refused to provide information to Schwarz regarding its investigation, then it failed to promptly review its files for Apex's business location, and, despite its statements to the contrary, National did not immediately contact the police or FBI regarding Schwarz's missing shipment. (*Id.* at ¶¶ 19-35.) Third, when Schwarz ultimately submitted her claim to National, National (and its insurer Vanliner) took roughly five months to process it, and then National sued Schwarz after she refused to accept its settlement offer. (*Id.* ¶¶ 41-44.)[8] Last, National also could have foreseen harm to Schwarz when Schwarz directly informed National that she was "on the verge of a nervous breakdown." (*Id.* at ¶ 38.) Moreover, the burden of guarding against these potential sources of injury, on the whole, seems low. *Corgan,* 574 N.E.2d at 606. Because these facts point to a foreseeable or probable risk that Schwarz could suffer emotional harm, National owed Schwarz a duty of care.[9]

### 2. An Issue of Material Fact Exists as to Whether National Caused an Injury to Plaintiff

On this issue, National contends that Schwarz cannot prove causation where Schwarz's

---

[8]     These reasons also undercut National's arguments that Schwarz cannot recover damages for "fear of losing her household goods," or for that conduct about which she was "unaware." (R. 79-1; Def.'s Mem. in Supp. of Summ. J. at 11-12.) Indeed, as these reasons indicate, Schwarz's emotional harm potentially resulted from any number of factors (about which Schwarz was aware) aside from, or in addition to, any "fear of losing her household goods." *See also* Analysis Section II, *supra* (listing some potential sources of Schwarz's harm aside from the loss of her household goods).

[9]     In addition to arguing that it lacked a duty of care, National further contends that Schwarz cannot "invoke tort principles to recover contract damages." (R. 79-1; Def.'s Mem. in Supp. of Summ. J. at 10.) But, as National's cited authority on this point makes clear, if a duty exists to avoid a foreseeable risk of emotional harm (like here), then a defendant can be liable in tort. *See Doe v. Roe,* 289 Ill. App. 3d 116, 127, 224 Ill. Dec.325, 333-34, 681 N.E.2d 640, 648-649 (1st Dist. 1997) (construing *Corgan*).

emotional distress allegedly stemmed from National's declaratory judgment action. As National sees things, it "has no duty to prevent its insurer from exercising its legal right to avail itself of the court system . . . [because] there is a constitutional right of access to the courts, both to sue and defend." (R. 79-1; Def.'s Mem. in Supp. of Summ. J. at 7.) Even if the constitutional right to access meant that filing suit cannot be a factor in causing emotional distress (and National's cited authorities do not squarely say that such is the case), this argument would not warrant summary judgment. A reasonable jury could conclude that, in addition to, or apart from, Vanliner's decision to pursue a declaratory judgment, National engaged in conduct that caused emotional distress. More importantly, National's argument, which rests on the premise that *its insurer* sued Schwarz, is wholly unsupported. (*Id.*) In fact, National does not dispute that it, not Vanliner, was the party who sued Schwarz for a declaratory judgment, (R. 98-1; Def.'s Resp. to Pl.'s SAMF at ¶ 44.) Indeed, the complaint itself confirms as much. (R. 8-1; Def.'s Mot. to Transfer Venue, Ex. 2.) Accordingly, there is, at a minimum, a material issue of fact as to whether National's conduct on the whole caused an injury to Schwarz.

### 3. An Issue of Material Fact Exists as to Whether Oregon's Exception to the Impact Rule Applies

National argues that it is entitled to summary judgment because Schwarz cannot satisfy the requirements of Illinois' impact rule. As determined above, however, Oregon, not Illinois, law controls the impact rule analysis here. Under Oregon law, Schwarz does not need proof of physical impact as long as she can establish that her emotional distress resulted from the abuse of a special relationship. Because there is a question of fact as to whether such a relationship existed, the Court cannot grant National's motion for summary judgment.

"Whether a relationship is special is driven by the facts." *Shin*, 199 Or. App. at 366, 111

P.3d at 770 (citing *Strader v. Grange Mutual Ins. Co.*, 179 Or. App. 329, 334, 39 P.3d 903

(2002). The "common thread" among those cases that have found special relationships is that

"the party who owes the duty has a special responsibility toward the other party." *Shin*, 199 Or.

App. at 367, 111 P.2d at 771; *see also Eulrich v. Snap-On Tools Corp.*, 121 Or. App. 25, 36, 853

P.2d 1350, 1357 (cited in *Shin* for proposition that a manufacturer-dealer relationship ordinarily

is not special, but may become so if a dealer places complete control of critical aspects of the

dealer's person, property or economic interests in the hands of the manufacturer); *but see*

*Rustvold v. Taylor*, 171 Or. App. 128, 138-39, 14 P.3d 675, 680-81 (2000) (a physician-patient

relationship can, but does not necessarily, include a duty to avoid negligent infliction of

emotional distress). "This is so because the party who is owed the duty effectively has

authorized the party who owes the duty to exercise independent judgment in the former party's

behalf and in the former party's interests." *Conway v. Pacific Univ.*, 324 Or. at 239, 924 P.2d at

824 (examining relationships that give rise to a heightened duty to exercise reasonable care in

negligent misrepresentation context); *see also Curtis,* 148 Or. App. at 620, 941 P.2d at 609

(applying *Conway*'s analysis in negligent infliction of emotional distress context). "In doing so,

the party who is owed the duty is placed in a position of reliance upon the party who owes the

duty; that is, because the former has given responsibility and control over the situation at issue to

the latter, the former has a right to rely upon the latter to achieve a desired outcome or

resolution." *Conway*, 324 Or. at 239, 924 P.2d at 824. "This special relationship exists in

situations in which one party has hired the other in a professional capacity, as well as in principal

agent and other similar relationships." *Id.* (further noting that in relationships involving a

heightened duty of care "one party has authorized the other to exercise independent judgment in

his or her behalf and, consequently, the party who owes the duty has a special responsibility to administer, oversee, or otherwise take care of certain affairs belonging to the other party").

In addition, Oregon law requires that the heightened duty assumed by a defendant "include[] a specific duty to avoid the infliction of emotional distress," and "the alleged invasion of that interest [must be] of sufficient importance to warrant the award of damages for emotional distress." *Shin*, 199 Or. App. at 365, 111 P.2d at 770. "[W]here the underlying loss is an economic or property loss that predictably also results in emotional distress, the invasion is not of sufficient importance to warrant an award of damages for emotional distress." *Id.* (citing *Meyer v. 4-D Insulation Co., Inc.*, 60 Or. App. 70, 74-75, 652 P.2d 852 (1982) (Oregon cases allowing damages for emotional distress all involve "an interference with the person beyond the inconvenience and distress always resulting from interference with property").

Here, Schwarz hired National in a professional capacity and tendered possession and complete control of her belongings to National. In doing so, Schwarz, in effect, authorized National "to exercise independent judgment [on her] behalf and in [her] interests" and thus had a "right to rely upon [National] to achieve a desired outcome or resolution," namely the timely delivery of her belongings. *Conway*, 324 Or. at 240, 924 P.2d at 824. In addition, the Court cannot conclude, as a matter of law, that National did not have a heightened duty to prevent Schwarz's emotional injury, especially in light of the fact that, while her belongings were still missing, Schwarz informed National that she was "on the verge of a nervous breakdown." (R. 92-1; Pl.'s SAMF at ¶ 35.) Nor can the Court conclude that Schwarz's claimed emotional distress is rooted only in the loss of property because a reasonable jury could conclude that National's independent *treatment of Schwarz* caused Schwarz's harm. *See* Analysis Sections II,

III.F.1 *supra* (listing some potential sources of Schwarz's harm); *Shin*, 199 Or. App. at 365, 111 P.2d at 770. Whether a special relationship exists such that the impact rule does not apply is an issue properly left to the jury. *Shin*, 199 Or. App. at 365, 111 P.2d at 770 (summary judgment inappropriate where there were material issues of fact as to whether a special relationship existed).

## IV.     Intentional Infliction of Emotional Distress

National also moves for summary judgment on Schwarz's claim of intentional infliction of emotional distress. In particular, National contends that Schwarz cannot establish any of the essential elements of the claim: (1) that National's conduct was extreme and outrageous, (2) that National knew there was a high probability that his or her conduct would cause severe emotional distress or intended to cause severe emotional distress,[10] or (3) that National's conduct in fact caused severe emotional distress. *McGrath v. Fahey*, 126 Ill. 2d 78, 86, 127 Ill. Dec. 724, 727, 533 N.E.2d 806, 809 (1988)); *Welsh v. Commonwealth Edison Co.*, 306 Ill. App. 3d 148, 154, 239 Ill. Dec. 148, 713 N.E.2d 679 (1999). The Court first addresses whether National's conduct was extreme and outrageous.[11]

---

[10]     For essentially the same reasons described in Analysis Sections II, III.F.1, there is at least an issue of material fact as to whether such a high probability existed.

[11]     Schwarz asserts that Illinois and Oregon law conflict as to whether a plaintiff can recover punitive damages for an intentional infliction of emotional distress claim, and further asserts that this conflict means that Oregon law should apply to all issues related to this claim. Whatever the merits of the supposed conflict, it need not be addressed here. National has not moved for summary judgment on Schwarz's request for punitive damages. So, in light of the principles of depecage, and even assuming that Illinois and Oregon law conflict, it would not affect the Court's application of Illinois law to the other substantive issues of Schwarz's intentional infliction claim. *See Vantassell-Matin*, 741 F. Supp. at 703; *see also Wood v. Mid-Valley Inc.*, 942 F.2d at 427.

## A. Extreme and Outrageous Conduct

Whether conduct is extreme and outrageous is evaluated on an objective standard. *Harriston v. Chicago Tribune Co.*, 992 F.2d 697, 703 (7th Cir.1993). Liability "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or trivialities." *Public Finance Corp. v. Davis*, 66 Ill. 2d 85, 89-90, 4 Ill. Dec. 652, 654, 360 N.E.2d 765, 767 (1976). Rather, "[l]iability [ ] attache[s] only in circumstances where the defendant's conduct is so extreme in degree as to go beyond all possible bounds of decency." *Id.* "It is well-settled under Illinois law that the 'determination of whether . . . conduct can be characterized as extreme and outrageous depends on the facts of each case.'" *Bristow v. Drake Street, Inc.*, No. 87 C 4412, 1987 WL 19797, *3 (N.D. Ill. Nov. 6, 1987) (quoting *Hearon v. City of Chicago*, 157 Ill. App. 3d 633, 635, 110 Ill. Dec. 161, 163, 510 N.E.2d 1192, 1194 (1st Dist. 1987)).

A court should consider several factors when evaluating whether the alleged conduct is extreme and outrageous. *McGrath*, 126 Ill. 2d at 86-91, 127 Ill. Dec. 727-729, 533 N.E.2d at 809-11. First, the more power and control that a defendant has over a plaintiff, the more likely defendant's conduct will be deemed outrageous. *McGrath*, 126 Ill. 2d at 86-87, 127 Ill. Dec. at 727, 533 N.E.2d at 809. This factor should be viewed in conjunction with a second factor – whether the defendant reasonably believed that his objective was legitimate. *McGrath*, 126 Ill. 2d at 88, 127 Ill. Dec. 728, 533 N.E.2d at 810. A reasonable belief that his objective was legitimate does not automatically allow the defendant to pursue that objective by outrageous means, but it is a substantial factor in evaluating the outrageousness of the conduct. *Id.* Another consideration is the defendant's awareness that the plaintiff is particularly susceptible to emotional distress. *McGrath*, 126 Ill. 2d at 89-90, 127 Ill. Dec. 729, 533 N.E.2d at 811.

"Behavior which (though rude, abrasive or extremely inconsiderate) may not otherwise be actionable may be deemed outrageous if the defendant knows that the plaintiff is peculiarly susceptible to emotional distress." *Id.* (citation omitted). Courts must consider these factors in light of all of the facts and circumstances in a particular case, and the presence or absence of any of these factors is not necessarily critical to a cause of action for intentional infliction of emotional distress. *McGrath*, 126 Ill. 2d at 90, 127 Ill. Dec. 729, 533 N.E.2d at 811.

### 1. The Power and Influence of National

The higher the degree of power held by the harassing party, the more likely it is that the conduct will be deemed outrageous. *McGrath*, 126 Ill. 2d at 86-87, 127 Ill. Dec. at 727, 533 N.E.2d at 809. Indeed, "behavior need not consist of vituperative attacks to rise to the level of extreme and outrageous conduct when there is a power differential inherent in the situation." *See Chen*, 2002 WL 1632412 at *7; *see also McGrath*, 126 Ill. 2d at 88, 127 Ill. Dec. at 728, 533 N.E.2d at 810 ("[t]he extreme and outrageous nature of the conduct may arise not so much from what is done as from abuse by the defendant of some relation or position which gives him actual or apparent power to damage the plaintiff's interests") (internal quotation omitted). Power, standing alone however, does not transform mere insults or indignities into extreme and outrageous conduct. *See Chen*, 2002 WL 1632412 at *7 (citing *Plocar v. Dunkin' Donuts of America, Inc.*, 103 Ill. App. 3d 740, 59 Ill. Dec. 418, 431 N.E.2d 1175, 1180 (1981)).

A reasonable jury could conclude that a power differential is inherent in the situation here. As Schwarz points out, National wielded some apparent, if not actual, power just by virtue of its control over Schwarz's belongings. *See Chen*, 2002 WL 1632412 at *7; *see also McGrath*, 126 Ill. 2d at 88, 127 Ill. Dec. at 728, 533 N.E.2d at 810. Because National wielded some power,

it is more likely that a reasonable jury could conclude, together with the factors discussed below, that National's conduct was extreme and outrageous.

## 2. Whether National Reasonably Believed that Its Objective Was Legitimate

In determining whether National's position of power elevates its conduct to the level of extreme and outrageous behavior, the Court should also consider whether National reasonably believed its conduct furthered legitimate aims. *McGrath*, 126 Ill. 2d at 88, 127 Ill. Dec. 728, 533 N.E.2d at 810. Indeed, courts accord greater latitude to a defendant pursuing a reasonable objective even if that pursuit results in distress for the plaintiff. *See Public Finance*, 4 Ill. Dec. 652, 360 N.E.2d at 768. National has offered no argument on this point, however, thus rendering this factor a non-factor.

## 3. National's Knowledge of Schwarz's Susceptibility to Emotional Distress

The final issue for the Court to consider is whether the defendant was aware of the plaintiff's peculiar susceptibility to emotional distress. *See McGrath*, 126 Ill. 2d at 89-90, 127 Ill. Dec. 729, 533 N.E.2d at 811. National argues that the "record contains no evidence that National intended to cause Plaintiff to suffer emotional distress, or that there was a high probability that such distress would result from National's conduct. Mere conclusory allegations in the Complaint will not suffice." (R. 77-1; Def.'s Mem. in Supp. of Mot. for Summ. J. at 14.) The Court disagrees with National's assessment. After all, National had received a voicemail message from Schwarz wherein she stated that "she was on the brink of a nervous breakdown," that she was "being tortured" by National, and that she "can't take it anymore." (R. 92-1; Pl.'s SAMF at ¶ 38.) Considering the sum of the three relevant factors in the light most favorable to

Schwarz, a reasonable jury could conclude that National's conduct was extreme and outrageous. *See Chen*, 2002 WL 1632412 at *9.

### B.    Severity

National also argues that Schwarz's emotional distress is not sufficiently severe to sustain her claim. *McGrath*, 126 Ill. 2d at 86, 127 Ill. Dec. 727, 533, N.E.2d at 809 (the distress inflicted must be so severe that no reasonable person could be expected to endure it). When viewed in a light most favorable to Plaintiff, Schwarz has experienced hysterical reactions, hyperventilation, shaking, crying, recurring nightmares, a twitching limb, and eczema. In addition, Schwarz is depressed and despondent and has been diagnosed with a severe adjustment disorder. On these facts, the Court cannot say, as a matter of law, that Schwarz has not experienced severe emotional distress. *See Buckley v. Jones Truck Lines, Inc.*, 778 F. Supp. 449, 452 (N.D. Ill. 1991) (summary judgment not appropriate where discovery showed that plaintiffs experienced depression, anxiety, and post-traumatic stress disorder syndrome); *see also Graham v. Commonwealth Edison Co.*, 318 Ill. App. 3d 736, 749, 252 Ill. Dec. 320, 330-31, 742 N.E.2d 858, 868-69 (5th Dist. 2000) (finding allegations of stomach pain, lack of sleep, headaches, and stress-related acne sufficiently severe to sustain claim of intentional infliction of emotional distress). The Court's "conclusion is strengthened by the faith . . . 'in the ability of jurors to fairly determine what is, and is not, emotional distress." *Buckley,* 778 F. Supp. at 452 (quoting *Corgan*, 158 Ill. Dec. at 496, 574 N.E.2d at 609). National has failed to carry its summary judgment burden as to Schwarz's claim of intentional infliction of emotional distress.

### CONCLUSION

For these reasons, National's motion for summary judgment is denied.

Dated: June 22, 2005                                    ENTERED


                                                       _____
                                                       AMY J. ST EVE
                                                       United States District Judge